**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**GAINESVILLE DIVISION**

| | | |
|---|---|---|
| AMNET ESOP CORPORATION d/b/a AMERICAN MORTGAGE NETWORK, | : | |
| | : | |
| Plaintiff, | : | Civil Action   2:23-cv-00010-RWS |
| v. | : | |
| | : | |
| CROSSCOUNTRY MORTGAGE, INC., SPENCER THOMAS, and WILLIAM MYERS | : | |
| | : | |
| | : | |
| Defendants. | : | |
| | : | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff AmNet ESOP Corporation d/b/a American Mortgage Network ("AmNet" or the "Company"), by way of its Complaint against CrossCountry Mortgage, Inc. ("CrossCountry"), Spencer Thomas ("Thomas") and William Myers ("Myers") (collectively, the "Defendants") states as follows:

## PRELIMINARY STATEMENT

AmNet brings this action against Defendants for intentional interference with contractual and prospective economic relations, breaches of contract and other common law duties, the use of false representations and misrepresentations to pass off their services as those of AmNet in violation of the Lanham Act and violations of state and federal law protecting trade secrets and confidential information.

CrossCountry solicited Thomas, an AmNet employee to join its employ, usurp confidential information from AmNet to CrossCountry for its benefit and divert numerous loans. Thomas accepted a position with CrossCountry before leaving AmNet's employ and used his final

months to improperly divert loans to CrossCountry. Thomas spent this time appearing to work for the benefit of AmNet, all while transferring his pipeline of loans and referrals to CrossCountry.

CrossCountry was not merely aware of these actions, it was facilitating and encouraging these actions. Throughout his final weeks at AmNet, CrossCountry employees were assisting Thomas in his diversion of loans. The following allegations set forth the relevant and supportive facts:

## **PARTIES**

1.      AmNet is a licensed mortgage lender incorporated under the laws of the State of Delaware with its headquarters and principal place of business located at 347 3rd Avenue, Chula Vista, California 91910.

2.      CrossCountry is a licensed mortgage lender incorporated under the laws of the state of Ohio with its headquarters and principal place of business located at 6850 Miller Road, Brecksville, Ohio 44141.

3.      Defendant William Myers is an adult individual and resident of the State of Ohio, upon information and belief, residing at 1675 Ansel Road, Apt 831, Cleveland, Ohio 44106. Defendant Myers is employed by CrossCountry as a Production Manager.

4.      Defendant Thomas is an adult individual and resident of the State of Georgia, residing at 2373 Bronze Oak Lane, Braselton, Georgia 30517. Defendant Thomas was employed by AmNet as a branch manager and senior loan officer.

5.      Defendant William Myers oversees and heads the "Transition Desk" for Cross Country.

6.      Defendant Myers is responsible for developing and maintaining the practices complained of herein.  Defendant Myers at all times had the opportunity to implement practices and procedures to avoid the theft of trade secrets and other properties of competitors as complained of herein.

2

7.     Instead, Defendant Myers maintains operations designed to incentivize, encourage, facilitate and assist loan officers to steal the confidential information and trade secrets of their current employers for Cross Country's financial benefit. Defendant Myers thus orchestrated and oversaw the pattern and practice of activities Cross Country and Thomas engaged of herein.

## JURISDICTION AND VENUE

8.     Jurisdiction is appropriate in this Court pursuant to 28 U.S.C. §§ 1331 and 1367 as the claims arise under the laws of the United States.

9.     In the alternative, jurisdiction is appropriate in this Court pursuant to 28 U.S.C. § 1332 as the amount in controversy exceeds $75,000 and the citizenship of Defendants is diverse from that of the Plaintiff.

10.     This Court has personal jurisdiction over Thomas because he is a resident of the State of Georgia.

11.     This Court has personal jurisdiction over CrossCountry because of its intentional contacts with the State of Georgia. Specifically, CrossCountry has continuous and systematic contact with Georgia and regularly conducts business in Georgia through its branch locations in Alpharetta, Suwanee, Kennesaw, Smyrna, Roswell, Senoia, Newnan, and Columbus, Georgia.

12.     In addition, CrossCountry has contacts arising from AmNet's causes of actions whereby CrossCountry intentionally engaged in tortious conduct aimed at the State of Georgia to benefit its operations and increase the volume of lending at its branches located in Georgia.

13.     This Court has jurisdiction over Defendant William Meyers for overseeing and implementing an enterprise of racketeering activity that has engaged in tortious activity and caused tortious injury within the state.

14.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391, as a substantial part of the events giving rise to the claims asserted herein occurred in this District, and Defendants are subject to jurisdiction in this District.

## FACTS

### AmNet and Defendant Thomas

15.     In August 2019, AmNet hired Thomas as a Branch Manager / Senior Loan Officer.

16.     Thomas executed an Employment Agreement with AmNet at the inception of his employment setting forth the terms and conditions of his employment, as well as post-termination obligations and restrictions.

17.     A true and accurate copy of Thomas's Employment Agreement is attached hereto as Exhibit A.

18.     Pursuant to this agreement, Thomas agreed to "devote his [] full time and attention to the affairs of the Company," not to engage in activities that, "directly or indirectly, compete with the Company," "to refrain from divulging or disclosing any [AmNet] Confidential Information to other and from using such Confidential Information, except for the benefit of the Company," and "to refrain from taking any other actions that would tend to destroy or reduce the value of the Confidential Information to [AmNet]."[1]

19.     The post-termination obligations and restrictions provided in these agreements state that Thomas is not permitted to: disclose or use any confidential materials, solicit, hire, or attempt to hire, or induce or attempt to induce to leave the Company any person who was employed or engaged by the Company during his employment and for a period of one (1) year thereafter.[2]

---

[1] Exhibit A, ¶¶ 3, 10
[2] Exhibit A, ¶¶ 10, 13.

20.     Thomas was legally obligated to protect AmNet's confidential information and trade secrets and its borrowers' non-public information.

21.     Thomas was subject to requirements of the Department of Housing and Urban Development and the National Mortgage Licensing System and required to work for only one lender and to properly disclose to borrowers the lender with whom the borrowers were engaged.

22.     Thomas was entrusted with AmNet's leads, customer loan applications, marketing strategies, consumer and loan lists, consumer identifying and financial information and pricing information, and were expected to use such resources to originate loans to be funded by and through AmNet.

23.     Moreover, such information was to be maintained exclusively for AmNet's benefit and was not to be disclosed outside of AmNet.

24.     A borrower who is using or considering using AmNet's services provides AmNet with a wide variety of personal and confidential information, including Social Security numbers, dates of birth, contact information, sensitive credit history, wage statements, bank account numbers, mortgage amounts, tax returns, and all the financial information that is necessary to facilitate a home loan.

25.     AmNet's prospective customers provide this highly sensitive private and confidential information with the understanding AmNet will protect it. AmNet is required to maintain the privacy of this information by extremely strict federal laws that carry substantial penalties if violated.

26.     AmNet does not release, share, or disclose such confidential information to the general public.  AmNet maintains the secrecy of this confidential information and derives an economic and competitive advantage from maintaining the secrecy of such information.

27.     There is also significant commercial value to this information. Whereas lenders spend millions of dollars aggregately on leads, a lender typically has far more information on an active file created for a prospective borrower – even before application – than any lead.  For instance, even if there is simply a pre-approval obtained before application, a lender will know credit scores, debt to income ratios, and the potential borrower's actual interest in pursuing a mortgage. Thus, the information and knowledge possessed by AmNet carries significant commercial value that is lost if disclosed to another lender.

28.     Indeed, if a competitor obtains this information, it undercuts AmNet on AmNet's loans and diverts AmNet's consumers by aggressively pursuing those consumers based on the information kept by AmNet.

**Thomas Leaves for CrossCountry**

29.     On or around May 2022, Thomas began secret discussions with CrossCountry to leave AmNet and work for CrossCountry.

30.     Until his departure in August 2022, with CrossCountry's knowledge and encouragement, Thomas diverted AmNet borrowers to CrossCountry.

31.     AmNet has reviewed its Loan Operating System and the majority of the loans identified herein were not closed with AmNet.

32.     For example:

   a.   On August 18, 2022, Thomas, while he was still employed by AmNet, received an email indicating that he was working on a loan at CrossCountry and that borrower information was being provided to CrossCountry. This loan did not close with AmNet.

b.  On August 1, 2022, borrower Whirrell was pre-approved by Thomas on behalf of AmNet. Thomas then diverted AmNet borrower Whirrell to CrossCountry while Thomas was still employed by AmNet.

c.  On May 25, 2022, borrower Adams submitted a loan application to AmNet. This loan did not close with AmNet. Rather, upon information and belief, this loan closed with CrossCountry.

d.  On June 1, 2022, borrower Hale submitted a loan application to AmNet. This loan did not close with AmNet. Rather, upon information and belief, this loan closed with CrossCountry.

e.  On July 18, 2022, borrower Deitzler submitted a loan application to AmNet. This loan did not close with AmNet. Rather, upon information and belief, this loan closed with CrossCountry.

f.  On July 27, 2022, borrower Di Pento submitted a loan application to AmNet. This loan did not close with AmNet. Rather, upon information and belief, this loan closed with CrossCountry.

33.  Thomas diverted these loans with the assistance and encouragement of CrossCountry and at all times he remained licensed with AmNet, held out to the public and AmNet that he was exclusively licensed with AmNet, and used his position of trust and confidence with AmNet to obtain access to sensitive information and divert these borrowers and loans to Cross Country

34.  Cari Lapinski, a loan officer assistant at CrossCountry, and Amber Schuiteman, a senior processor at Cross Country, are just some of the CrossCountry employees who directly assisted in Thomas's unlawful loan diversion.

35.    Moreover, during this time and while still employed by AmNet, Thomas was actively recruiting AmNet's employees, as well as other candidates, to join CrossCountry.

36.    Following his departure from AmNet, Thomas continued to attempt to recruit AmNet's employees.

37.    According to CrossCountry's website, Thomas is now a loan officer at the Alpharetta branch.

38.    At all times, CrossCountry was aware of Thomas's contractual and legal obligations to AmNet.

39.    CrossCountry's behavior was part of a pattern and practice that it regularly engages in to unlawfully divert loans from competitors using their employees.

40.    CrossCountry had a formal process that included a "Transition Desk" that enabled the smooth diversion of loans to CrossCountry by loan officers joining CrossCountry from other lenders by transmitting confidential borrower and loan information via email from competitors to CrossCountry.

41.    CrossCountry's transition desk is a separate department that CrossCountry has used to electronically divert loans from numerous competitors as well, such Annie Mac. *American Neighborhood Mortgage Acceptance Company, LLC v. CrossCountry Mortgage, Inc.*, Case No. 2:20-cv-00874 (D. N.J. 2020).

42.    Defendant Myers heads the transition desk as well as the group of loan officers who work with the transition desk to assist onboarding loan officers with diverting and transferring loans started at their former employers to be closed at CrossCountry.

43.    Defendant Myers reports to Craig Montgomery, the Chief Production Officer. Upon information and belief, Montgomery, who joined CrossCountry at the same time as Defendant

Myers, has at all relevant times overseen Defendant Myers in his work supervising the transition desk.

44.     CrossCountry provided employees of AmNet a dedicated migration team to aid in transitioning their loans by electronically transmitting confidential and non-public information from AmNet to CrossCountry to ensure their pipeline of loans at AmNet could smoothly be diverted and in some instances even closed with CrossCountry, while they were still employed by AmNet. *Id.*

45.     CrossCountry also established a dedicated migration team to aid employees of Loan Depot in diverting their loans to CrossCountry. *LoanDepot.com LLC v. CrossCountry Mortgage, Inc.*, Case No. 2:18-cv-12091 (D. N.J. 2018).

46.     Currently, there are approximately nine (9) loan officers who work with the transition desk. Among them are Jonathan Wick, Daniel Jordan Gourash, Cody Bertke, Kenneth Todd VanCleave and Brian Vollmer. These loan officers spend a substantial portion of their time moving loans from the current, soon to be former, employers of loan officers who are joining CrossCountry.

47.     CrossCountry also similarly directed employees of Freedom mortgage to unlawfully divert loans from Freedom to CrossCountry through employees that CrossCountry was actively soliciting, while those individuals were still employed by Freedom. *Freedom Mortgage Corporation v. CrossCountry Mortgage, Inc.*, Case No. 1:17-cv11528 (D. N.J. 2017); *Freedom Mortgage Corporation v. CrossCountry Mortgage, Inc.*, Case No. 2:18-cv-5783 (E.D. N.Y. 2018); *Freedom Mortgage Corporation v. CrossCountry Mortgage Inc.*, Case No. 2:18-cv-00270 (D. Nev. 2018).

48.     Cross Country engaged in similar practices with respect to loan officer at Caliber Home loans, incentivizing loan officers employed at Caliber to divert information about borrowers and pending loans to Cross Country, in some cases without the borrowers' knowledge.  Caliber claims

these activities caused it to lose 2.3 Billion dollars of loan origination volume.  *See Caliber Home*

*Loans v. Cross Country Mortgage,* Case No. 2:22-cv-00616-RAJ (W.D. Wash.).

49.     Cross Country has also engaged in similar actions with respect to Guild Mortgage. In a

complaint filed in the Western District of Washington, Guild cites to dozens of examples where its

loan officers – while still employed by Guild, began transferring information about borrowers,

transitioning and soliciting borrowers – with and without their knowledge and permission – to

switch their application to Cross Country while these employees remained employed and licensed

by Guild.  *Guild Mortgage Company v. Cross Country Mortgage Company LLC*, Case No.: 2:21-

cv-01376-JCC.

50.     Another lender, loanDepot has sued Cross Country alleging that:

> Through CrossCountry's onboarding and recruitment activities, CrossCountry
> orchestrated the resignation of Defendants [Employees] … and facilitated the breach of
> their duty of loyalty and contractual obligations, by among other things … their expedited
> removal of confidential client information and files, and the conversion of loanDepot
> customers to CrossCountry customers; providing a "migration team" dedicated to their
> transition; facilitating the improper transfer of loanDepot customers to CrossCountry
> through a "referral desk" and "referral" staff and personnel.

51.     These analogous complaints and accusations are not merely an unfortunate pattern of

activity by CrossCountry.  Rather, CrossCountry has established written policies and procedures,

that formally facilitate and encourage loan officers while employed at a competitor to send

confidential information and customers from their current employer to Cross Country.  Indeed,

Cross Country has teams set up specifically to facilitate the transition and transfer of loans from

competitors using their current loan officers as Cross Country's agents despite the fact that those

loan officers remain licensed with and employed by competitors.

52.     In taking these actions, Cross Country is aware that their competitors, such as AmNet,

Annie Mac, loanDepot, Caliber Home Loans, Freedom Mortgage and other entities have

proprietary and trade secret rights to the borrower information, that federal licensing laws prohibit these loan officers from simultaneously working for other lenders, and that federal laws are intended to avoid borrower confusion so that borrowers know the lender with whom a loan officer is affiliated.

53.    CrossCountry is also aware of the value of pending customers and applications with a lender and that such information is protected from public disclosure; meaning that CrossCountry would never learn of these borrowers, obtain access to their information, or have the chance to divert those borrowers from its competitors but for creating and maintaining the falsehood that CrossCountry's newly hired loan officers remained trusted loyal employees of their soon to be former employers.

54.    CrossCountry has an ongoing plan and infrastructure called the "Transition Desk" literally dedicated to instructing, incentivizing, encouraging, facilitating and assisting loan officers to remain with their employer while loans are being transferred, misrepresent their loyalty and licensure status, and conceal the fact that they are actually working for the benefit of CrossCountry.

55.    This is all done for the purpose of gaining access to and diverting proprietary information, trade secrets and customers from other lenders.

56.    Defendant Myers is responsible for overseeing the complete operations of the Transition Desk" and maintaining practices intentionally and specifically designed to facilitate the theft of competitors' trade secrets.  Defendant Myers' and Defendant Cross Country's practices amount to an unlawful enterprise under the Racketeer Influenced and Corrupt Organizations Act.

57.    CrossCountry and Defendant Myers are also well aware of the type of employment agreements that branch managers and loan officers in the mortgage industry typically have and CrossCountry has been in litigations for interfering with them previously.

58.     In fact, CrossCountry has even provided legal advice to loan officers who it is soliciting from competitors and who CrossCountry is helping to divert loans and poach employees and offered those loan officers indemnity should their previous employers bring actions against them for their unlawful activity. *Homeside Financial, LLC v. CrossCountry Mortgage Inc., et al.*, Case No. 8:18-cv-02639 (D. Md. 2018).

59.     CrossCountry engaged in the same pattern of activity when it recruited Thomas and provided him with assistance to unlawfully divert loans from AmNet, for CrossCountry's benefit.

60.     To date, AmNet is aware of at least approximately 15 loans that Thomas diverted to CrossCountry worth approximately $7 million.

## COUNT ONE – BREACH OF CONTRACT
(Against Defendant Thomas)

61.     AmNet repeats and realleges its allegations in Paragraphs 1 - 60 as if set forth in their entirety herein.

62.     In his employment agreement, Thomas agreed to the restrictive covenants that prohibit him from usurping and disclosing AmNet's confidential information and from improperly disclosing and/or transferring non-public borrower information.

63.     Pursuant to his employment agreement, Thomas was contractually obligated not to disclose any of AmNet's confidential information.

64.     Thomas breached his confidentiality obligations to which he agreed by disclosing and misappropriating AmNet's confidential information for his own benefit and the benefit of CrossCountry.

65.     As a result of Thomas's violations of his contractual obligations, AmNet has suffered monetary losses and will continue to suffer these losses going forward due to lost business and good will.

## COUNT TWO – BREACH OF FIDUCIARY DUTY/ DUTY OF LOYALTY
(Against Defendant Thomas)

66.     AmNet repeats and realleges its allegation in Paragraphs 1 - 65 as if set forth in their entirety herein.

67.     As an employee of AmNet, Thomas owed a duty of loyalty to AmNet during the term of his employment, which prohibited the solicitation of AmNet's customers for his own benefit while still employed.

68.     Thomas further breached his duty of loyalty to AmNet by soliciting its employees to leave AmNet and work for CrossCountry, while they were still employed by AmNet, as well as diverting customers from AmNet and usurping business opportunities in direct competition with AmNet.

69.     These actions were orchestrated and undertaken by Thomas while an employee of AmNet, to which he owed duties of loyalty and fair dealing.

70.     As a result, AmNet has suffered and will continue to suffer damages associated with Thomas' wrongful actions.

## COUNT THREE – AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
(Against CrossCountry)

71.     AmNet repeats and realleges its allegation in Paragraphs 1-70 as if set forth in their entirety herein.

72.     Thomas committed violations of his fiduciary duties while acting at CrossCountry's instructions, with CrossCountry's full support and encouragement.

73.     CrossCountry incentivized, encouraged and facilitated Thomas to Breach his fiduciary duty by providing the instrumentalities to divert borrowers to Cross Country while he was employed by AmNet.

74.     The actions of CrossCountry facilitated, assisted and encouraged Thomas to breach his fiduciary duties and rewarded such breaches of fiduciary duty.

75.     CrossCountry's unlawful conduct has caused AmNet damages and AmNet will continue to suffer irreparable injury.

**COUNT FOUR**
**<u>VIOLATION OF THE LANHAM ACT, 15 U.S.C. 1125(a)</u>**
(against Defendants Thomas and Cross Country)

76.     AmNet repeats and realleges its allegations in Paragraphs 1 - 75 as if set forth in their entirety herein.

77.     Thomas made material misrepresentations to numerous consumers that the consumers were engaging in transactions with AmNet, and that AmNet would maintain their confidential information and originate, process and close their transactions.

78.     Thomas also misrepresented to consumers and potential consumers that he was engaging in and undertaking such transactions as a representative and agent of AmNet, when he was actually working on behalf of CrossCountry.

79.     Specifically, Thomas maintained in his NMLS profile his active licensure with AmNet and provided business cards, email signatures and various other instrumentalities representing he was an AmNet loan officer when in fact he was at all relevant times acting for the benefit of CrossCountry.

80.     Thomas was required under federal law to disclose to the public the actual lender with whom he worked, specifically to avoid consumer confusion. Instead of complying with such laws, he maintained a false and deceptive license that concealed his true employment with and for the benefit of Cross Country.

81.    CrossCountry was not only aware of these misrepresentations but encouraged and perpetuated them.

82.    CrossCountry employees communicated with borrowers who began their loans with Thomas at AmNet, asking for borrower information or communicating about the loan process, while Thomas was still an AmNet employee.

83.    In addition, the CrossCountry employees were asking AmNet borrowers for additional information so that CrossCountry, not AmNet, could close their loans.

84.    Thomas's communications with such customers used and displayed AmNet's licensing information specifically designed to allow borrowers to look up its NMLS license number to ascertain the Company's regulatory and legal history.

85.    Unbeknownst to AmNet's customers, Thomas was interacting with the customers with the intention of diverting them – and in fact, did so divert many of them – to CrossCountry, an AmNet competitor.

86.    This caused and continues to cause confusion among the consumers as to which company was providing them with a mortgage loan.  It created scenarios where borrowers – lured in under AmNet's reputation as reflected by its NMLS license number – were without their consent diverted to Cross Country.

87.    Moreover, information specifically entrusted to AmNet by consumers was surreptitiously provided to CrossCountry by Thomas, without Borrowers' consent to enable Cross Country to begin processing and underwriting these loans.

88.    CrossCountry and Thomas have been unjustly enriched as a direct and proximate result of their wrongful acts, and AmNet has suffered damages in an amount not yet fully determined.

89.     As a direct result of CrossCountry's actions, AmNet has been harmed and continues to be irreparably harmed by the loss of business and goodwill in the marketplace and consumers harmed through CrossCountry's material misrepresentations.

90.     The foregoing acts constitute unfair competition in violation of Section 43(a) of the Lanham Act.

91.     CrossCountry and Thomas have acted knowingly, willfully, and in conscious disregard of the rights of their consumers, AmNet, and the general public.

### COUNT FIVE
### TORTIOUS INTERFERENCE WITH CURRENT
### CONTRACTUAL AND PROSPECTIVE ECONOMIC RELATIONS
(against Defendants Thomas and CrossCountry)

92.     AmNet repeats and realleges its allegations in Paragraphs 1 – 91 as if set forth in their entirety herein.

93.     AmNet had contractual relationships with borrowers for whom it was originating mortgage loans and AmNet derived profit from these relationships.

94.     CrossCountry was aware of these relationships because it encouraged Thomas to disclose them and bring the borrowers to CrossCountry.

95.     Because of their relationships, Thomas was able to divert these customers and their loans to CrossCountry, for the benefit and profit of CrossCountry.

96.     AmNet had a reasonable expectation of future business relationships with potential consumers who indicated an interest in engaging AmNet's services by filling out a loan application or otherwise proceeding with the process for obtaining a mortgage.

97.     There was a reasonable probability that AmNet and these potential consumers would have entered into one or more contractual relationships because they provided their contact information or submitted applications to AmNet with the goal of obtaining a loan.

98.     Defendant CrossCountry knowingly and purposefully facilitated Thomas in diverting his pipeline of loans from AmNet to CrossCountry.

99.     CrossCountry engaged in these activities, fully aware of the actual and prospective business relationships using malicious and unlawful conduct to facilitate the diversion and interference of AmNet's actual and prospective business relationships as alleged herein.

100.    AmNet has suffered harm through the lost profits, loss of business and goodwill in the marketplace and with consumers due to CrossCountry's misconduct.

**COUNT SIX**
**UNFAIR COMPETITION**
(against Defendants Thomas and CrossCountry)

101.    AmNet repeats and realleges its allegations in Paragraphs 1 – 100 as if set forth in their entirety herein.

102.    CrossCountry, through Thomas, solicited AmNet's employees, diverted its customers and usurped AmNet's confidential information, including borrower and referral lists and confidential borrower and referral personal information.

103.    CrossCountry and Thomas did this maliciously, surreptitiously and with the intent to effectuate their scheme without AmNet's knowledge.

104.    CrossCountry engaged in this misconduct for the purpose of directly and unfairly competing with AmNet and stealing its customers and business opportunities.

105.    As a direct result of CrossCountry's and Thomas's actions, AmNet has suffered damages and continues to be harmed in the loss of business and goodwill in the marketplace.

### COUNT SEVEN
### MISAPPROPRIATION OF TRADE SECRETS
### IN VIOLATION OF GEORGIA TRADE SECRETS ACT
(against All Defendants)

106.   AmNet repeats and realleges its allegations in Paragraphs 1 –105 as if set forth in their entirety herein.

107.   AmNet devises independent economic value from its list of potential and actual customers and non-public borrower information, information which is not generally known, and AmNet took reasonable measures to maintain and protect the secret nature of the information.  As such, the lists constitute trade secrets under Georgia's Uniform Trade Secrets Act.

108.   Thomas was entrusted with this confidential and proprietary information in the performance of his job.

109.   At CrossCountry's behest, Thomas improperly and unlawfully accessed and disclosed these trade secrets to CrossCountry and CrossCountry utilized such trade secrets in breach of applicable law and duties, all to AmNet's detriment.

110.   CrossCountry's actions directly caused AmNet harm through the lost profits and loss of current and future business and good will.

111.   Unless AmNet is made whole through damages attributable to business and good will lost, CrossCountry's conduct has and will continue to cause AmNet harm.

### COUNT EIGHT
### VIOLATION OF THE DEFEND TRADE SECRETS ACT, 18 U.S.C.§ 1836 et seq.
(against Defendants Thomas and CrossCountry)

112.   AmNet repeats and realleges its allegations in Paragraphs 1 - 111 as if set forth in their entirety herein

113.   The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1839(3), defines a trade secret as, inter alia, "all forms and types of financial, business, scientific, technical, economic, or engineering

information … whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing" – provided that the owner took "reasonable measures to keep such information secret," and it offers the holder of the trade secret and advantage over competitors who do not know or use the trade secret.

114.   AmNet's list of potential and actual customers and non-public borrower information were kept secret by substantial measures undertaken by AmNet to protect the secret and private nature of the information.

115.   AmNet's trade secrets are related to products and/or services used in interstate commerce.

116.   Thomas entrusted with this confidential and proprietary information in the performance of his job.

117.   At CrossCountry's direction, Thomas improperly and unlawfully accessed and disclosed these trade secrets to CrossCountry, which knew or had reason to know that these trade secrets were acquired by improper means.

118.   CrossCountry utilized such trade secrets in breach of applicable law and duties, without AmNet's express or implied consent, all to AmNet's detriment.

119.   CrossCountry's actions directly caused AmNet harm through the loss of current and future business and good will.

120.   Unless AmNet is made whole through damages attributable to business and good will lost, CrossCountry's conduct has and will continue to cause AmNet harm.

**COUNT NINE**
**CIVIL RICO, 18 U.S.C. §§ 1961-1968, et seq.**
**(Against Defendants CrossCountry and Myers)**

121.   AmNet repeats and realleges its allegations in Paragraphs 1 - 120 as if set forth in their entirety herein.

122.   Defendants have committed a series of predicate acts by stealing AmNet's and other mortgage lenders' trade secrets and proprietary information in violation of the Defend Trade Secrets Act in violation of 18 USC §1962.  Further, Defendants have utilized mails and wires to perpetrate a fraud for purposes of obtaining access to competitors' trade secrets and diverting the value and benefit of those trade secrets for Cross Country's own unlawful purposes.

123.   Defendants Myers and Cross Country have engaged in a pattern of racketeering activity by maintaining a deliberate system and infrastructure to steal trade secrets from other competitors utilizing deceptive means and instrumentalities by instructing individuals to maintain a facade of licensure and employment to maintain access to and divert such information to CrossCountry.

124.   Defendant Myers oversees and commands the Transition Desk, maintaining and implementing practices that are intentionally designed to cause loan officers to steal trade secrets for Cross Country before they leave its competitors' employment.

125.   Defendants Cross Country and Myers have at all times relevant hereto acted with intent by setting up a formal structure to instruct and encourage loan officers to surreptitiously transfer loans and information to Cross Country with full knowledge and awareness that doing so is defrauding its competitors from their protected trade secrets.

126.   CrossCountry and Myers are acutely aware of the importance and value of a lender's pending loan files and yet has a formal process to instruct employees to remain employed with a competitor so that they can maintain access to the competitor's trade secrets for the purpose of diverting them to CrossCountry, notwithstanding federal regulations that require loan officers to identify the company with whom they work and their fiduciary, legal and contractual duties to safeguard such trade secrets.

127.   Defendants Myers and Cross Country have not only engaged in predicate acts but have conspired to do so in the future by continuing to operate the Transition Desk for the sole purpose despite knowing that trade secrets are being diverted by loan officers because of and through the Transition Desk.  Yet, Defendants Myers and CrossCountry continue to maintain the Transition Desk to enable and encourage loan officers to send trade secrets to Cross Country while they are employed by a competitor and before leaving that Competitor to commence employment with Cross Country.

128.   Defendants Myers and Cross Country have utilized this unlawful infrastructure to steal trade secrets and proprietary information from multiple lenders nationwide, and Defendants will continue to engage in such actions unless the pattern of unlawful conduct is addressed.

129.   Defendants Myers and Cross Country have caused harm and damage to AmNet through encouraging and enabling Thomas to divert and steal AmNet's trade secrets for the benefit of Cross Country by deceiving AmNet into believing he was its loyal employee to retain access to its trade secrets so that they could be stolen on behalf and for the benefit of Cross Country.

## COUNT TEN - CONSPIRACY
(against All Defendants)

130.  AmNet repeats and realleges its allegations in Paragraphs 1 - 129 as if set forth in their entirety herein.

131.  CrossCountry and Thomas together engaged in the overt acts of diverting loans to CrossCountry while Thomas was employed by AmNet and using AmNet's facilities and resources.

132.  These overt actions caused AmNet damages through the loss of earnings, business and customers, and goodwill in the marketplace.

## **PRAYER FOR RELIEF**

WHEREFORE, as to all counts, Plaintiff respectfully requests that the Court enter judgment in its favor and award the following relief against Defendants:

    a.  Permanently restraining Thomas from violating the restrictive covenants in his Employment Agreement, including from further disclosing AmNet's confidential information and by soliciting AmNet's employee for a period of 12 months.

    b.  Compelling CrossCountry and Thomas to provide an accounting of all loans that Thomas has closed, or has attempted to close by sending borrower information to CrossCountry from May 2022 to the present;

    c.  Disgorgement of the profits CrossCountry realized as a result of closing the loans that were improperly diverted from AmNet;

    d.  From all Defendants, actual and compensatory damages, including but not limited to AmNet's lost profits, attorneys' fees and expenses and costs of pursuing this matter and any compensation or equity improperly paid to Defendant Thomas;

    e.  From CrossCountry, double or treble actual damages and punitive damages as appropriate;

    f.  Interest; and

    g.  Such other relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff AmNet hereby demands a trial by jury of all issues triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

MITCHELL SANDLER LLC

_____
Ari Karen
1120 20th Street NW
Suite 725
Washington, DC 20036
202-886-5260
xxx-xxx-xxxx (facsimile)
akaren@mitchellsandler.com

Dated: January 10, 2023