## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

|  |  |
|---|---|
| AMNET ESOP CORPORATION, | |
| Plaintiff, | Civil Action No. |
| v. | 2:23-cv-10-RWS |
| CROSSCOUNTRY MORTGAGE, INC., et al., | |
| Defendants. | |

## <u>ORDER</u>

This case comes before the Court on Defendants' respective motions to dismiss and related filings: Defendant CrossCountry Mortgage, Inc.'s ("CrossCountry") Motion to Dismiss Counts Three through Twelve [Dkt. 34]; Defendant Spencer Thomas' ("Thomas") Motion to Dismiss [Dkt. 35]; and Defendant William Myers' ("Myers") Motion to Dismiss [Dkt. 36]. Having reviewed the record, the Court enters the following Order.

## BACKGROUND

The facts below are taken from Plaintiff's Amended Complaint ("Am. Compl.") [Dkt. 24-1], and all factual allegations are accepted as true, and viewed

in the light most favorable to Plaintiff AmNet.  Glover v. Liggett Grp., Inc., 459

F.3d 1304, 1308 (11th Cir. 2006).

### A. AmNet & Spencer Thomas

AmNet is a licensed mortgage lender.  [Am. Compl. ¶ 1].  In August 2019,

AmNet hired Spencer Thomas as a Branch Manager / Senior Loan Officer.  [Am.

Compl. ¶ 12].

At the outset of his employment, Thomas executed an Employment

Agreement promising, among other things, not to disclose or use confidential

information belonging to AmNet and not to compete with AmNet.  [Am. Compl.

¶¶ 13-15; Exhibit A]. The Employment Agreement included post-termination

obligations and restrictions as well, including an agreement not to disclose or use

any confidential materials, solicit, hire, or attempt to hire, or induce or attempt to

induce to leave AmNet any person who was employed or engaged by AmNet

during Thomas's employment for a period of one year after separation from

employment.  [Am. Compl. ¶ 16].

In his position as Branch Manager and Senior Loan Officer, Thomas had

access to AmNet's leads, customer loan applications, marketing strategies,

consumer and loan lists, consumer identifying and financial information, and

pricing information.  [Am. Compl. ¶ 19].  AmNet claims the information Thomas

had access to was highly sensitive and confidential and to be maintained exclusively for AmNet's benefit, that AmNet maintained the secrecy of the confidential information, and that its information had significant commercial value. [Am. Compl. ¶¶ 23-25].

### B. CrossCountry, William Myers & Thomas

According to AmNet, on or around May 2022, Thomas began secret discussions with CrossCountry and planned to leave AmNet and work for CrossCountry. [Am. Compl. ¶ 26]. Thomas accepted a position with CrossCountry prior to leaving AmNet's employ in August 2022. [Am. Compl., Preliminary Statement, ¶¶ 29, 37].

CrossCountry is a mortgage lender and a competitor of AmNet's. CrossCountry solicits, originates, processes, and funds residential mortgage loans and then services and/or sells those mortgages on the secondary mortgage market. [Am. Compl. ¶ 27]. CrossCountry's normal channel for origination of mortgage loans is through its employee loan officers who are licensed with the Nationwide Mortgage Licensing System ("NMLS") to solicit and originate residential

mortgage loans.  [Am. Compl. ¶ 27].  CrossCountry's normal practice is to service or sell the loans it originates after closing.  [Am. Compl. ¶ 27].[1]

For the next several months, until Thomas departed AmNet in August 2022, with CrossCountry's and, upon information and belief, William Myers' knowledge and encouragement, Thomas diverted AmNet borrowers to CrossCountry utilizing the practices, procedures, and instrumentalities implemented and supervised by Myers to facilitate Thomas' theft of AmNet's trade secrets.  [Am. Compl. ¶¶ 29, 32-33].[2]

Myers oversaw and implemented a department known as the "Transition Desk" ostensibly to facilitate the onboarding of loan officers joining CrossCountry. [Am. Compl. ¶¶ 32, 42].  According to AmNet, the actual purpose of the Transition Desk under Myers' direction was to encourage and assist loan officers employed and licensed with competitors to misuse their licensure and employment with competitors to gain access to trade secrets and secretly engage in licensed activities

---

[1] The Amended Complaint does not expressly allege but does imply that CrossCountry's normal practice following loan origination is not how AmNet operates.

[2] According to CrossCountry's website, Thomas is now a loan officer at CrossCountry's Alpharetta branch.  [Am. Compl. ¶ 37].

on behalf of CrossCountry during the transition process while not licensed with CrossCountry.  [Am. Compl. ¶ 32].

AmNet asserts that CrossCountry and Myers were aware of Thomas's contractual and legal obligations to AmNet. [Am. Compl. ¶ 38].  AmNet also asserts that Myers' Transition Desk is an example of CrossCountry's behavior and pattern and practice to unlawfully divert loans from competitors using their competitors' employees while the employees are still licensed with the competitor. [Am. Compl. ¶ 39].[3]  After recruiting new loan officers for CrossCountry, Myers would encourage the loan officers to remain employed at their prior employer to allow them to siphon pending leads and loan opportunities, pending loans, and private borrower information to CrossCountry, and then loans would be handled in accordance with CrossCountry's procedures. [Am. Compl. ¶ 40]. AmNet alleges that Myers knew that utilizing loan officers who were not licensed with CrossCountry to engage in origination on behalf of CrossCountry by engaging with borrowers to discuss potential loan scenarios with CrossCountry was in violation of state and federal laws.  [Am. Compl. ¶ 40].

---

[3] CrossCountry has faced other civil actions brought by competitors alleging similar violations, including actions brought by LoanDepot.com LLC, Freedom Mortgage Corporation, Caliber Home Loans, Guild Mortgage Company, and Homeside Financial, LLC.  [Am. Compl. ¶¶ 49-61].

As a loan officer, Thomas was subject to national licensing requirements of lenders requiring that he work for only one lender and disclose to prospective borrowers the lender with whom the borrowers were engaged.  [Am. Compl. ¶ 18].[4]

At all times, Thomas remained licensed with AmNet, held out to the public and AmNet that he was exclusively licensed with AmNet, and used his position of trust and confidence with AmNet to obtain access to sensitive information and divert trade secrets, borrowers, and loans to CrossCountry without being licensed with CrossCountry.  [Am. Compl. ¶ 33].  According to the Amended Complaint, Thomas was effectively "unlicensed" to proceed as the transitioning loan officer on CrossCountry's behalf.  [Am. Compl. ¶ 41 and n.3].

While still employed with AmNet, Thomas also actively recruited other AmNet employees, and other candidates for employment, to join CrossCountry. [Am. Compl. ¶ 35].  Thomas continued to attempt to recruit AmNet employees after leaving AmNet.  [Am. Compl. ¶ 36].

---

[4] Licensed activities for loan officers include any discussion with borrowers about potential loan scenarios and any discussions facilitating or relating to those loan scenarios.  [Am. Compl. ¶ 28].

AmNet alleges that approximately 15 loans worth approximately $7 million were diverted by Thomas and Myers to CrossCountry while Thomas was not licensed with CrossCountry.  [Am. Compl. ¶ 64].

### C. AmNet's Causes of Action

AmNet's Amended Complaint alleges the following causes of action: Count One: Breach of Contract (against Thomas); Count Two: Breach of Fiduciary Duty / Duty of Loyalty (against Thomas); Count Three: Aiding and Abetting Breach of Fiduciary Duty (against CrossCountry); Count Four: Violation of the Lanham Act, 15 U.S.C. § 1125(a), (against Thomas & CrossCountry);  Count Five: Tortious Interference with Current Contractual and Prospective Economic Relations (against Thomas and CrossCountry); Count Six: Unfair Competition (against Thomas and CrossCountry); Count Seven: Misappropriation of Trade Secrets in violation of Georgia Uniform Trade Secrets Act (against all Defendants); Count Eight: Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836 (against Thomas and CrossCountry); Count Nine: Civil RICO in violation of 18 U.S.C. §§ 1961-1968, *et seq*. (against CrossCountry and Myers); Count Ten: Conspiracy (against all Defendants); Count Eleven: Conspiracy to Violate RICO (against all Defendants); and Count Twelve: Georgia Civil RICO (against Myers and CrossCountry).

In its prayer for relief, AmNet seeks permanent injunctive relief against Thomas, an order compelling CrossCountry and Thomas to provide an accounting of all loans closed by Thomas (or attempted) by sending borrower information to CrossCountry from May 2022 through the commencement of the case, disgorgement of profits to CrossCountry for diverted loans, actual and compensatory damages, including AmNet's lost profits, attorneys' fees and expenses and costs. AmNet also seeks double or treble actual damages and punitive damages as appropriate against CrossCountry, any ill-gotten compensation and benefits resulting from Thomas' unlawful conduct, plus interest.

## LEGAL STANDARD

Rule 8 requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  While this standard does not require "detailed factual allegations," neither will mere "labels and conclusions" suffice. Bell Atl. Corp. v. Twombly, 127 S. Ct. 1955, 1964-65 (2007). Instead, the complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009); John Mills, LLC v. Finley, 2020 WL 6073872, at *1 (N.D. Ga. Apr. 14, 2020) (citation omitted). A claim to relief is "plausible on its face" when the facts

support a "reasonable inference that the defendant is liable for the misconduct alleged." Id.; Gates v. Khokhar, 884 F.3d 1290, 1296 (11th Cir. 2018).

When a party challenges a complaint under Rule 12(b)(6), the Court must "accept the facts alleged in the complaint as true, drawing all reasonable inferences in the plaintiff's favor." Gates, 884 F.3d at 1296. However, the Court ignores legal conclusions or factual contentions masquerading as legal conclusions. Iqbal, 129 S. Ct. at 1949.  Indeed, the Court's "first task is to eliminate any allegations in [the Amended Complaint] . . . that are merely legal conclusions."  Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1293 (11th Cir. 2010) (citing Iqbal, 129 S. Ct. at 1951).  If the complainant has stated facts that plausibly support relief, the claim survives the motion and proceeds.

The Court now considers Defendants' respective challenges to Plaintiff's Amended Complaint.[5]

---

[5] Defendants emphasize throughout the briefing that Plaintiff AmNet filed its Amended Complaint after Defendants originally moved for dismissal under Rule 12(b)(6) and argue that AmNet is still unable to cure many of the deficiencies identified in the initial Rule 12 filings.

## DISCUSSION

### A. Breach of Contract

Plaintiff AmNet alleges that Defendant Thomas breached the terms of the Employment Agreement.  In Georgia, the elements of breach of contract are: (1) a valid contract; (2) material breach of its terms; and (3) damages arising therefrom." Transmax Prods., LLC v. Swartzberg, 2020 WL 5095370, at *8 (N.D. Ga. Aug. 28, 2020) (quoting Brooks v. Branch Banking & Tr. Co., 107 F. Supp. 3d 1290, 1295 (N.D. Ga. 2015)); see also Norton v. Budget Rent A Car Sys., Inc., 307 Ga. App. 501, 502 (2010) (describing Georgia breach of contract elements as "(1) breach and the (2) resultant damages (3) to the party who has the right to complain about the contract being broken"). "A contracting party generally breaches a contract if it 'repudiates or renounces liability under the contract; fails to perform the engagement as specified in the contract; or does some act that renders performance impossible.'"  Transmax Prods., LLC, 2020 WL 5095370, at *8 (quoting UWork.com, Inc. v. Paragon Techns., Inc., 321 Ga. App. 584, 590 (2013)) (internal quotations omitted); Meunier Carlin & Curfman, LLC v. Scidera, Inc., 324 F. Supp. 3d 1269, 1278 (N.D. Ga. 2018).

"[A] plaintiff asserting a breach of contract claim must allege a particular contractual provision that the defendants violated to survive a motion to dismiss."

Brooks, 107 F. Supp. 3d at 1296 (quoting Anderson v. Deutsche Bank Nat'l Trust Co., 2012 WL 3756512, *5 (N.D. Ga. Aug. 6, 2012), report and recommendation adopted by 2012 WL 3756435 (N.D. Ga. Aug. 27, 2012)).

The heart of Plaintiff's breach of contract claim is that Thomas disclosed AmNet's "confidential information" to CrossCountry and did not devote his full time and attention to AmNet during his employment.[6] Plaintiff specifically alleges violation of Paragraphs 10-13 of the Employment Agreement.

Thomas contends that AmNet's breach of contract claim fails due to insufficient facts.  In challenging AmNet's allegations, Thomas suggests that, "[i]n the mortgage loan origination industry, borrowers often follow their chosen originator, irrespective of the mortgage lender for which that originator works." [Dkt. 35-1 at 16 n.33].  Thomas contends that AmNet's allegations are speculative and that the Court is permitted to consider this "obvious alternative explanation" for the fact that certain loans did not close with AmNet in evaluating his motion to dismiss.  [Id. (quoting Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1295

---

[6] It is not clear whether Plaintiff AmNet relies on its claim that Thomas solicited and recruited AmNet employees or candidates for employment to support Count One. In his challenge to Count Two, Thomas contends that the non-solicitation provision (paragraph 13) is unenforceable as a matter of law.

(11th Cir. 2010))].  This is an argument more appropriately made at trial or possibly summary judgment.

With respect to breach of contract, AmNet has alleged sufficient facts to survive Rule 12(b)(6). At minimum, the factual allegations support a reasonable inference in AmNet's favor that Thomas engaged in initial discussions with the five prospective AmNet borrowers that ultimately closed loans with CrossCountry and that Thomas did so while licensed with AmNet and while he was still on AmNet's clock. [Am. Compl. ¶¶ 30(a) – (f)].  AmNet contends it is entitled to seek discovery to flesh out how the prospective AmNet borrowers ultimately became CrossCountry customers. Accepting AmNet's factual allegations as true, and viewing the facts alleged in the light most favorable to AmNet, AmNet's allegations plausibly allege breach of contract and are sufficient to overcome Thomas's Rule 12(b)(6) motion.

Defendant Thomas's Motion to Dismiss is <u>denied</u> as to Count One.

## B. Breach of Fiduciary Duty & Duty of Loyalty

AmNet next asserts that Thomas breached his common-law fiduciary duties to AmNet by transitioning AmNet prospective borrowers to CrossCountry and soliciting AmNet employees. Thomas concedes that he owed a fiduciary duty to AmNet. Thomas contends that he was permitted to leave AmNet to work with

CrossCountry, that Thomas and CrossCountry are permitted to compete with AmNet for loans, and that Thomas' conduct did not constitute a breach of a duty of loyalty or a duty to engage in fair dealing.  According to Thomas, the Amended Complaint includes *no facts* that he did anything wrong and instead merely concludes that he must have.

"It is well settled that a claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach." Ansley Marine Const., Inc. v. Swanberg, 290 Ga. App. 388, 391 (2008) (citation and internal quotation marks omitted).[7]

"In Georgia, '[i]t is well settled that an employee does not breach a fiduciary duty to its employer by making plans to compete, even if those plans are made while the employer-employee relationship still exists.'" Gallagher Benefit Servs., Inc. v. Campbell, 528 F. Supp. 3d 1326, 1345 (N.D. Ga. 2021) (quoting Hanson Staple Co. v. Eckelberry, 297 Ga. App. 356, 358 (2009)). "Even though he can make plans to compete, however, an employee is not entitled to solicit customers for a rival business before the end of his employment nor can he properly do other

---

[7] Thomas does not dispute that he owed a fiduciary duty to AmNet or that AmNet adequately plead damages.

similar acts in direct competition with the employer's business." <u>Campbell</u>, 528 F. Supp. 3d at 1345 (quoting <u>Hanson</u>, 297 Ga. App. at 359) (punctuation omitted); <u>see also</u> <u>Tom's Amusement Co. v. Total Vending Servs.</u>, 243 Ga. App. 294, 295–96 (2000) ("[B]efore the end of his employment, no employee may solicit customers for a rival business nor otherwise directly compete with his employer's business.") Here, AmNet alleges more than an intent or plan to compete.

Plaintiff's Amended Complaint alleges sufficient facts to support its breach of fiduciary duty claim against Thomas. While in the employ of AmNet, Thomas admittedly owed a fiduciary duty to AmNet – including, duties of loyalty as well as a duty to engage in fair dealing. And AmNet alleges that the duties of loyalty and fair dealing prohibited Thomas from trying to solicit AmNet's customers for his own benefit while still employed and by diverting AmNet customers and usurping business opportunities in direct competition with AmNet.  [Am. Compl. ¶¶ 71, 72].

Thomas directs the Court to <u>Pro. Energy Mgmt., Inc. v. Necaise</u>, 300 Ga. App. 223 (2009), where plaintiff's allegations that the defendant (plaintiff's former employee) made plans to work for a competing business while still employed with plaintiff were sufficient to survive Rule 12(b)(6).  <u>Id.</u> at 225.  Thomas argues that the facts in <u>Necaise</u> are distinguishable in that plaintiff alleged defendant took multiple affirmative steps to persuade clients to terminate contracts with plaintiffs.

Arguably, the cases could be distinguished given that the <u>Necaise</u> case appears to have involved the termination of existing contracts and did not involve the mortgage industry and mortgage origination.  However, at this stage of the case, AmNet's allegations are sufficiently similar to reject Thomas's position. As held by the Georgia Court of Appeals, it was error for the trial court to dismiss plaintiff's breach of fiduciary duty claim because plaintiff's former employee "had a duty not to solicit its clients or directly compete with it during his employment[.]" <u>Id.</u>  The court also rejected defendants' preemption argument.  <u>Id.</u> at 225-26.

With respect to AmNet's allegation that Thomas also breached his fiduciary duty by soliciting AmNet employees to leave and work for CrossCountry, Thomas is correct that AmNet fails to allege any facts to support this claim.  For this reason, the Court need not discuss Thomas's argument that the non-solicitation provision at Paragraph 13 of the Employment Agreement is unenforceable.

Applying the principles described above, the Court finds that AmNet's allegations (minus allegations based upon solicitation of AmNet employees) are sufficient to survive Rule 12(b)(6) scrutiny.

Thomas's Motion to Dismiss is <u>granted in part</u> and <u>denied in part</u> as to Count Two.

### C. Aiding & Abetting Breach of Fiduciary Duty

AmNet asserts that CrossCountry aided and abetted Thomas in breaching his common-law fiduciary duties as an AmNet employee. In support of this cause of action, AmNet relies on the allegation that CrossCountry operated a "Transition Desk" aimed at diverting AmNet borrowers.  [Am. Compl. ¶ 29]. AmNet alleges that CrossCountry "facilitated, assisted, and encouraged" Thomas' conduct and then rewarded Thomas financially for breaching his fiduciary duty.  [Am. Compl. ¶ 78].  CrossCountry argues that the Amended Complaint fails to specify *how* CrossCountry aided and abetted Thomas and even fails to identify any communications CrossCountry had with Thomas.  CrossCountry contends that the only interaction between CrossCountry and Thomas alleged within the Amended Complaint is that CrossCountry hired Thomas as a loan officer.

To state a claim for aiding and abetting breach of fiduciary duty, AmNet must plausibly allege:

> (1)through improper action or wrongful conduct and without privilege, the defendant acted to procure a breach of the primary wrongdoer's fiduciary duty to the plaintiff; (2) with knowledge that the primary wrongdoer owed the plaintiff a fiduciary duty, the defendant acted purposely and with malice and the intent to injure; (3) the defendant's wrongful conduct procured a breach of the primary wrongdoer's fiduciary duty; and (4) the defendant's tortious conduct proximately caused damage to the plaintiff.

Curry v. Ameritrade, Inc., 2015 WL 11251449, at *14 (N.D. Ga. June 30, 2015).

Regarding the meaning of the phrase, "acted to procure a breach of the fiduciary duty," "[t]o procure "does not require the lending of assistance in the actual perpetration of the wrong," but requires the defendant give "advice, counsel, persuasion, or command ... in procuring any person to commit an actionable wrong." Angel Oak Mortg. Sols. LLC v. Mastronardi, 593 F. Supp. 3d 1234, 1243 (N.D. Ga. 2022) (citation and internal quotation marks omitted).

Beyond implementing the "Transition Desk," AmNet alleges that CrossCountry (via Myers) actively recruited loan officers like Thomas and purposefully encouraged the loan officers it was recruiting to remain employed at their prior employer to allow them to siphon pending leads and loan opportunities, pending loans, and private borrower information to CrossCountry. [Am. Compl. ¶ 40].  AmNet also alleges that CrossCountry provided Thomas with a financial incentive to breach his fiduciary duty to AmNet and then rewarded Thomas monetarily for breaching his duties to AmNet.  [Am. Compl. ¶¶ 77-78].  The Court finds AmNet's allegations sufficient to survive Rule 12.

CrossCountry's Motion to Dismiss is denied as to Count Three.

### C. Violation of the Lanham Act, 15 U.S.C. § 1125(a)

AmNet alleges that Thomas and CrossCountry violated the Lanham Act by leading consumers to believe that Thomas was originating loans on behalf of AmNet as opposed to CrossCountry. Thomas and CrossCountry seek dismissal.

Section 43(a) of the Lanham Act, codified at 15 U.S.C. § 1125(a), creates a federal cause of action for unfair competition and "forbids unfair trade practices involving infringement of trade dress, services marks, or trademarks, even in the absence of federal trademark registration." D. H. Pace Co., Inc. v. Aaron Overhead Door Atlanta LLC, 522 F. Supp. 3d 1315, 1328 (N.D. Ga. 2020) (quoting Univ. of Fla. v. KPB, Inc., 89 F.3d 773, 775-76 (11th Cir. 1996) (citations omitted)).[8]

---

[8] Section 43(a) provides in pertinent part:

> (a)(1) Any person who, on or in connection with any . . . services, . . . uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
> (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her . . . services, or commercial activities by another person. . .

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Section 1125(a) of the Lanham Act prohibits a person from using in commerce "any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with

In addition, Section 1125(a) is construed to extend beyond trademark protection to regulate certain false representations regarding the origin of goods and services provided. Dastar Corp. v. Twentieth Century Fox Film Corp., 123 S. Ct. 2041, 2045 (2003); see also ThermoLife Int'l, LLC v. Hi-Tech Pharms., Inc., No. 1:15-CV-00892-ELR, 2019 WL 12291350, at *7 (N.D. Ga. Nov. 1, 2019), report and recommendation adopted, No. 1:15-CV-00892-ELR, 2019 WL 12291385 (N.D. Ga. Nov. 25, 2019) (distinguishing between the two bases of liability under § 1125(a): false association and false advertising). A false association or false designation of origin claim . . . "occurs when a producer misrepresents his own . . . services as someone else's."[9] Dastar Corp., 123 S. Ct. at 2045 (citation and internal quotation marks omitted); Custom Mfg. & Eng'g, Inc. v. Midway Servs., Inc., 508 F.3d 641, 647 (11th Cir. 2007).

To state a claim for false designation of origin, AmNet must allege it was "either actually or likely to be damaged by the fact that the defendant used ['in commerce'] a 'false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which [wa]s likely to cause confusion,

---

another person, or as to the origin, sponsorship, or approval of his or her . . . services, or commercial activities by another person[.]" 15 U.S.C. § 1125(a).

[9] AmNet describes this as "passing off" one's services as the services of another.

or to cause mistake, or to deceive . . . as to the origin, sponsorship, or approval of his or her . . . services, or commercial activities by another person.'" Lipscher v. LRP Publ'ns, Inc., 266 F.3d 1305, 1312-13 (11th Cir. 2001).  Actual confusion need not be shown.  United States v. Torkington, 812 F.2d 1347, 1352 (11th Cir. 1987).  However, a likelihood of consumer confusion – more than a possibility -- is necessary to recover under the Lanham Act.  Custom Mfg. & Eng'g, Inc., 508 F.3d at 651 (citation omitted) (referring to likelihood of consumer confusion as "touchstone of liability").

In this case, AmNet alleges that Thomas made "material misrepresentations" to consumers by leading consumers to believe they were engaging in transactions with AmNet when Thomas was actually working to secure loans on behalf of CrossCountry.[10] [Am. Compl. ¶¶ 33, 81-91].  Plaintiff alleges that Thomas

---

[10] The parties disagree as to the pleading standard for AmNet's Lanham Act claim and whether particularity is required.

As a general principle, "[w]here a plaintiff alleges fraud or misrepresentation, the complaint must meet the heightened pleading requirements of Fed. R. Civ. P. 9(b)." ThermoLife Int'l, LLC, 2019 WL 12291350, at *2. To satisfy Rule 9(b), the complaint must identify:

(1) precisely what statements were made in what documents or oral representations or what omissions were made, and
(2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and

maintained in his NMLS profile his active licensure with AmNet and provided

business cards, email signatures and various other instrumentalities representing

that he was an AmNet loan officer while acting for the benefit of CrossCountry.

[Am. Compl. ¶ 83].  In response, Defendants assert that this is not the type of

conduct intended to be covered by the Lanham Act.[11]  Thomas asserts that

Plaintiff's Lanham Act claim must fail because Plaintiff's allegations concerning

Thomas' conduct, at best, reflect "an unactionable omission and not an affirmative

misrepresentation."  [Dkt. 42 - Thomas Reply, 9].[12]  AmNet does not allege that

---

       (3) the content of such statements and the manner in which they misled the
       plaintiff, and
       (4) what the defendants obtained as a consequence of the fraud.

Id. (citation omitted). The Court finds that AmNet met the specificity requirement as to
Thomas.

[11] There is some appeal to this contention, i.e., that the framework of the Lanham Act
does not fit the facts asserted here.  Defendants fail to cite any authority for the
proposition that the Lanham Act is not broad enough to encompass conduct that might
reasonably mislead a consumer concerning association or origin of services.

[12] See, e.g., Wyndham Vacation Ownership v. Reed Hein & Assoc., LLC, 2020 WL
12178190, at *8 (M.D. Fla.  Jan. 7, 2020) (citation omitted) (evaluating sufficiency of
Lanham Act claim for false advertising and granting motion to dismiss based on finding
that omissions in print ads did not constitute affirmative misrepresentation).  The Court
finds Wyndham distinguishable on its facts as the case involved a print ad that was
incomplete, and the facts alleged here are that Thomas used and displayed AmNet
credentials while actually working to benefit CrossCountry.

CrossCountry made any particular misrepresentation to consumers.  The Court now turns to Plaintiff's factual allegations and Defendants' respective challenges.

Thomas's challenge is unavailing.  As noted previously, Thomas was required under federal law to disclose the actual lender he was working for, specifically to avoid consumer confusion.  [Am. Compl. ¶ 84].  AmNet identifies the following facts that it contends plausibly caused confusion among consumers:

- CrossCountry employees [albeit unidentified] communicated with borrowers who began their loans with Thomas at AmNet, asking for borrower information or communicating about the loan process, while Thomas was still an AmNet employee [Am. Compl. ¶ 86]
- Thomas using and displaying AmNet's licensing information specifically designed to allow borrowers to look up AmNet's NMLS license number to ascertain AmNet's regulatory and legal history[;]" [Am. Compl. ¶ 88]
- Unbeknownst to AmNet's customers, Thomas was interacting with the customers "with the intention of diverting them" to CrossCountry; [Am. Compl. ¶ 89]
- Consumer confusion resulted in scenarios where borrowers – lured in under AmNet's reputation as reflected by its NMLS license number – were without their consent diverted to CrossCountry; [Am. Compl. ¶ 90]
- Information entrusted to AmNet by consumers was surreptitiously provided to CrossCountry by Thomas without Borrowers' consent to

enable CrossCountry to begin processing and underwriting these loans[;]  [Am. Compl. ¶ 91]

- AmNet has been harmed and continues to be irreparably harmed by loss of business and goodwill in the marketplace [Am. Compl. ¶ 93]; and

- CrossCountry and Thomas acted knowingly, willfully, and in conscious disregard of the rights of their consumers, AmNet, and the general public [Am. Compl. ¶ 95].

Viewing the above facts in the light most favorable to AmNet, the Court finds that the allegations plausibly support a reasonable inference that consumers were likely to be misled or experience confusion over the source of lending services or products.[13]  See, e.g., POWERbahn, LLC v. Found. Fitness LLC, 2021 WL 2689852, at *5–6 (N.D. Ga. Mar. 26, 2021) (citation omitted) ("the Lanham Act's general concern is with protecting consumers from confusion as to source"). The Court so finds based upon the allegations that Thomas utilized and displayed his existing AmNet license and other credentials to originate and/or subsequently

---

[13] Determining likelihood of confusion is a question of fact. Lipscher, 266 F.3d at 1313–14 (citing E. Remy Martin & Co., S.A. v. Shaw–Ross Int'l Imports, Inc., 756 F.2d 1525, 1529 (11th Cir. 1985)).  Factors helpful in evaluating likelihood of confusion include the defendant's intent and whether actual consumer confusion occurred.  Id. at 1313; Suntree Techs., Inc. v. Ecosense Int'l, Inc., 693 F.3d 1338, 1348 (11th Cir. 2012).

convert loan packets from AmNet loans to CrossCountry loans.  More specifically, AmNet alleges that Thomas utilized his AmNet signature block and NMLS profile during the relevant time period and that, by doing so, Thomas made material misrepresentations that he was acting as an AmNet agent while simultaneously funneling loans to CrossCountry.

CrossCountry's challenge is meritorious. Read as a whole, and viewing the facts alleged in the light most favorable to AmNet, AmNet's allegations certainly imply active participation and cooperation by CrossCountry. Yet, AmNet fails to identify any misrepresentation made to prospective borrowers by CrossCountry or its employees.[14] Beyond CrossCountry hiring Thomas, AmNet's allegations center around CrossCountry's use of its Transition Desk. AmNet's allegations concerning CrossCountry are insufficient to sustain the Lanham Act claim under either Rule 8 or 9(b) standard.

---

[14] AmNet argues in opposition that CrossCountry employees communicated with borrowers without identifying themselves as CrossCountry employees.  [Dkt. 38 - Pl. Opp'n to CrossCountry MTD at 44].  As argued by CrossCountry, the allegation that CrossCountry employees did not identify themselves properly is not found within the Amended Complaint [Am. Compl. ¶¶ 86-87] and so it is not considered by the Court. See Beavers v. City of Atlanta, Georgia, 2015 WL 1509485, at *8 (N.D. Ga. Mar. 31, 2015).

For these reasons, the Court finds that AmNet's factual allegations are sufficient to survive Rule 12 as to Defendant Thomas only.

Defendant Thomas's Motion to Dismiss is <u>denied</u> as to Count Four.

Defendant CrossCountry's Motion to Dismiss is <u>granted</u> as to Count Four.

### D. Violation of the Defense Trade Secrets Act, 18 U.S.C. § 1836, and the Georgia Trade Secrets Act, O.C.G.A. § 10-1-762

AmNet alleges that Defendants CrossCountry and Thomas violated the Defense Trade Secret Act ("DTSA") and the Georgia Trade Secret Act ("GTSA").[15]

DTSA, 18 U.S.C. § 1836, *et. seq.*, creates a private cause of action for "an owner of a trade secret that was misappropriated … if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1); <u>Solvay Specialty Polymers USA, LLC v. Zhenguo (Leo) Liu</u>, 331 F.R.D. 187, 191 (N.D. Ga. 2019); <u>Agilysys, Inc. v. Hall</u>, 258 F. Supp. 3d 1331, 1348 (N.D. Ga. 2017).

---

[15] The Amended Complaint inadvertently references the New Jersey Trade Secret Act in the label for Count Seven [Am. Compl. at 27] but AmNet is plainly seeking relief under the GTSA [Am. Compl. ¶ 111]. There also appears to be an error regarding the description under Count Seven which indicates that this claim is brought against "All Defendants[,]" including Myers.  If not a typographical error, this claim is dismissed as to Myers.

Likewise, to plausibly allege violation of the GTSA, Plaintiff must allege

facts establishing "(a) the existence of a trade secret; and (b) the misappropriation

of that trade secret." Solvay Specialty Polymers USA, LLC, 331 F.R.D. at 191

(citing O.C.G.A. § 10-1-762 (2)(A)–(B)); Agilysys, Inc., 258 F. Supp. 3d at 1348.

## 1. Existence of a Trade Secret

Georgia Code defines "Trade secret" as follows:

> [I]nformation, without regard to form, including, but not limited
> to, technical or nontechnical data, a formula, a pattern, a compilation,
> a program, a device, a method, a technique, a drawing, a process,
> financial data, financial plans, product plans, or a list of actual or
> potential customers or suppliers which is not commonly known by or
> available to the public and which information:
> (A) Derives economic value, actual or potential, from not being
> generally known to, and not being readily ascertainable by proper
> means by, other persons who can obtain economic value from its
> disclosure or use; and
> (B) Is the subject of efforts that are reasonable under the
> circumstances to maintain its secrecy.

O.C.G.A. § 10-1-761(4).  To be entitled to protection under the GTSA, a

plaintiff must prove both (A) and (B); that the information derives economic

value from not being generally known and that the information is subject to

reasonable efforts to maintain secrecy. Mauser USA, LLC v. Wilburn, No.

1:19-CV-02361-AT, 2019 WL 8376209, at *3 (N.D. Ga. Nov. 22, 2019)

(citation omitted).

Determining whether a trade secret exists is a fact-intensive inquiry. See

Capital Asset Research Corp. v. Finnegan, 160 F.3d 683, 686 (11th Cir. 1998);

Camp Creek Hospitality, Inc. v. Sheraton Franch. Corp., 139 F.3d 1396, 1410–11

(11th Cir. 1998); see also 1 R. Milgram, Milgram on Trade Secrets, § 2.23 at 2–

32–33 (1984) ("Existence of a trade secret is a question of fact for the

determination of the trier of fact, secrecy being a basic element.");

RESTATEMENT OF LAW, THIRD, Unfair Competition, § 39, cmt. d).

AmNet alleges that the information Thomas had access to was highly

sensitive and confidential and to be maintained exclusively for AmNet's benefit,

that AmNet maintained the secrecy of the confidential information, and that its

information had significant commercial value.  [Am. Compl. ¶¶ 23-25].  In the

Amended Complaint, AmNet alleges that "Thomas was entrusted with AmNet's

confidential and proprietary information, including company-generated leads,

customer loan applications, marketing strategies, loan lists, and pricing

information. [Am. Compl. ¶ 19].[16] It is well-settled that customer lists, "business

---

[16] According to AmNet, the customer information Thomas had access to "contained
highly sensitive and non-public personal information provided by borrowers, including
Social Security numbers, dates of birth, contact information, credit history, wage
statements, bank account numbers, tax returns, and all financial information necessary to
facilitate a mortgage loan."  [Am. Compl. ¶¶ 21-22].

information," and "sensitive client information such as names, addresses, telephone numbers, monetary amounts, and notes including needs or preferences," constitute trade secrets. G.W. Henssler & Assocs., Ltd. v. Marietta Wealth Mgmt., LLC, No. 1:17-CV-2188-TCB, 2017 WL 6996372, at *4 (N.D. Ga. Oct. 23, 2017).

AmNet also sufficiently alleges efforts undertaken to protect the secrecy of its information.  [Am. Compl. ¶¶ 13-14, 21-25].  And see G.W. Henssler, 2017 WL 6996372, at *4; accord Amedisys Holding, LLC v. Interim Healthcare of Atlanta, Inc., 793 F. Supp. 2d 1302, 1311 (N.D. Ga. 2011); and see, e.g., AirWatch LLC v. Mobile Iron, Inc., No. 1:12-CV-3571-JEC, 2013 WL 4757491, at *4 (N.D. Ga. Sept. 4, 2013) ("The [c]ourt cannot say at the motion to dismiss stage that the steps [plaintiff] took to restrict how customers used its program and who had access to its program were inadequate to maintain this information's secrecy.").

Viewing the allegations in the well-pleaded complaint in the light most favorable to AmNet, the Court finds that AmNet plausibly alleges that it possesses trade secrets that fall within the DTSA and GTSA.

### 2. Misappropriation

Under both the DTSA and GTSA, prohibited "misappropriation" includes: "(a) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (b) disclosure or

use of a trade secret of another without express or implied consent. . . ." 18 U.S.C.
§ 1839 (5); O.C.G.A. § 10-1-761(2).

Given Thomas' legal position, it is important to acknowledge that "[a]
person who leaves the employment of another has a right to take with him all the
skill he has acquired, all the *knowledge* he has obtained, and all the *information*
that he has received, so long as nothing is taken that is *the property of the*
*employer.* Trade secrets are *the property of the employer* and cannot be taken or
used by the employee for his own benefit, but *customers are not trade secrets.*
Knowledge on the part of the employee concerning the names and addresses of
customers is *not* the property of the employer." Avnet, Inc. v. Wyle Lab'ys, Inc.,
263 Ga. 615, 618 (1993) (emphasis supplied and internal quotation marks omitted)
(quoting Taylor Freezer Sales Co., Inc. v. Sweden Freezer E. Corp., 224 Ga. 160,
165(2) (1968)).  Even so, as noted earlier, AmNet's allegations go beyond
customer information and extend to the following categories of internal AmNet
information: company-generated leads, marketing strategies, loan lists, and pricing
information. [Am. Compl. ¶ 19].

Given Plaintiff's allegations that Thomas disclosed its confidential and
proprietary information without AmNet's consent and that CrossCountry
subsequently acquired the same information via Thomas, the Amended Complaint

plausibly alleges misappropriation. At this stage of the case, Plaintiff's allegations are sufficient to state a claim for misappropriation of trade secrets under both statutory schemes.

Defendants' Motions to Dismiss are <u>denied</u> as to Counts Seven and Eight.

### E. State Law Claims Alleging Unfair Competition, Tortious Interference, & Civil Conspiracy

The GTSA "supersede[s] conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret." O.C.G.A. § 10-1-767(a).[17] Put differently, the GTSA "preempts claims that rely on the same allegations as those underlying the Plaintiff's claim for misappropriation of a trade secret." <u>Agilysys, Inc.</u>, 248 F. Supp. 3d at 1349 (quoting <u>Robbins v. Supermarket Equip. Sales, LLC</u>, 290 Ga. 462, 466 (2012)). The critical inquiry is whether the same factual allegations of misappropriation are being used to obtain relief outside the GTSA. <u>Robbins</u>, 290 Ga. at 466. To the extent a plaintiff's tort claims rely on the same allegations as those underlying the plaintiff's claim for

---

[17] The reasoning for preemption is that "it would make little sense to go through the rigamarole of proving information was truly a trade secret if a plaintiff could alternatively plead claims with less burdensome requirements of proof." <u>Mauser USA, LLC v. Wilburn</u>, No. 1:19-CV-02361-AT, 2019 WL 8376209, at *3 (N.D. Ga. Nov. 22, 2019) (citations and internal quotation marks omitted).

misappropriation of a trade secret, those tort claims are precluded. <u>Diamond Power</u>

<u>Intern., Inc. v. Davidson</u>, 540 F. Supp. 2d 1322, 1344 (N.D. Ga. 2007).[18]

AmNet suggests that its state law claims are premised on a broader set of

facts; that Defendants' conduct went beyond the misappropriation of trade secrets.

In evaluating whether the state law claims are preempted by GTSA, the Court next

considers the facts AmNet relies upon for each cause of action.

### 1. Unfair Competition

"[A] claim for unfair competition [in] Georgia.... provides [a] civil remedy

for deceptive or fraudulent conduct by another, not necessarily a competitor, that

causes an actual diversion of trade from one business to another because of the

confusion resulting from the tortfeasor's acts[.]" <u>Arno Res., LLC v. Epic Tech,</u>

<u>LLC</u>, 2022 WL 3970756, at *12 (N.D. Ga. Aug. 8, 2022), <u>aff'd</u>, 2023 WL 6534500

(11th Cir. Oct. 6, 2023).

---

[18] In <u>Diamond Power</u>, the court explained how a conflict might arise between the GTSA and a state law tort-based claim where supported by the same allegations. 540 F. Supp. 2d at 1344. At the same time, "the court acknowledged if a claim seeks to remedy an injury caused not by the misappropriation of proprietary information, but by separate conduct— such as the misappropriation of physical property or the improper interference with contractual relationships respecting something other than proprietary information—such a claim cannot be said to be 'in conflict' with the GTSA." <u>Pro. Energy Mgmt., Inc. v. Necaise</u>, 300 Ga. App. 223, 224–25 (2009).

AmNet's unfair competition claim, which mimicks the Lanham Act claim [Am. Compl. ¶ 94], is premised upon the alleged unlawful diversion of AmNet's customers and loan files. AmNet contends that it is permitted to concurrently plead the misappropriation of trade secrets with unfair competition and other claims without triggering preemption. The undersigned agrees. Indeed, CrossCountry concedes that it only seeks preemption in part, or for the aspect of AmNet's unfair competition claim based upon alleged misappropriation of AmNet's proprietary information.  [Dkt. 43 – CrossCountry Reply, at 10].  And see Angel Oak Mortg. Solutions v. Mastronardi, 593 F. Supp. 3d 1234, 1239 (N.D. Ga. 2022). Like the Lanham Act claim, the viability of AmNet's unfair competition claim is better left for summary judgment.

Defendants' Motions to Dismiss are granted, in part, and denied, in part. More specifically, Defendants' motions are granted as to Count Six to the extent that AmNet bases unfair competition on the alleged misappropriation of AmNet's proprietary information and denied in all other respects.

### 2.  Tortious Interference

AmNet alleges that Thomas and CrossCountry tortiously interfered with AmNet's current contractual and prospective economic relations.

For the tortious interference with a contract claim, "a plaintiff must establish the existence of a valid contract and that the defendant acted intentionally, without privilege or legal justification, to induce another not to enter into or continue a business relationship with the plaintiff, thereby causing the plaintiff financial injury." Agilsys, Inc., 258 F. Supp. 3d at 1353 (citing Atlanta Mkt. Ctr. Mgmt., Co. v. McLane, 269 Ga. 604, 608 (1998)).

For the tortious interference with a business claim, the plaintiff must demonstrate that the defendant (1) acted improperly and without privilege, (2) purposely and with malice with the intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with the plaintiffs, and (4) for which the plaintiffs suffered some financial injury. Id. at 1354.

In Necaise, the Georgia Court of Appeals held that plaintiff's tortious interference with contractual relations claim was cognizable and not preempted by plaintiff's GTSA claim where plaintiff's complaint asserted that defendant solicited plaintiff's customers on behalf of a competitor prior to terminating his employment with plaintiff.  300 Ga. App. at 225-26 (stating that the "alleged solicitation of plaintiff's customers for a rival business is conduct outside the scope of the GTSA" and not preempted).  The allegations deemed sufficient in Necaise are analogous enough to the allegations asserted by AmNet to survive.

33

Defendants' motions are <u>denied</u> as to Count Five.

### 3. Civil Conspiracy

"A conspiracy is a combination of two or more persons to accomplish an unlawful end or to accomplish a lawful end by unlawful means." <u>Mustaqeem-Graydon v. SunTrust Bank</u>, 573 S.E.2d 455, 461 (Ga. App. 2002) (citation omitted); <u>accord</u> <u>Agilysys</u>, 258 F. Supp. 3d at 1355 (quoting <u>J. Kinson Cook of Ga, Inc. v. Heery/Mitchell</u>, 284 Ga. App. 552**,** 559-60 (2007)). To recover damages for a civil conspiracy claim, a plaintiff must show that two or more people, acting in concert, engaged in conduct that constitutes a *tort*. <u>Id.</u> (emphasis added). Without the underlying tort, liability for civil conspiracy cannot exist. <u>Id.</u>

AmNet alleges that, between May 2022 and August 2022, CrossCountry, Myers, and Thomas deliberately combined efforts to steal AmNet's confidential information. Specifically, they had an "understanding that, before [Thomas] . . . started working for [CrossCountry], [he] would copy or remove [AmNet]'s confidential . . . information." <u>Vurv Tech. LLC v. Kenexa Corp.</u>, No. 1:08-CV-3442-WSD, 2009 WL 2171042, at *9 (N.D. Ga. July 20, 2009) (sustaining claim where defendants allegedly "established outside channels of communication" to steal confidential information).  AmNet's civil conspiracy claim fails for multiple reasons.

First, Defendant Myers persuasively argues that AmNet's allegations against him are wholly speculative. The Court agrees. With respect to Myers, AmNet's Amended Complaint either states a conclusion or prefaces its allegations with "upon information and belief." AmNet's allegations against Myers are premised entirely on his connection with the CrossCountry Transition Desk.[19] Even more, AmNet relies on other civil actions brought against CrossCountry by competitors and Myers' experience in the industry to infer knowledge. [Am. Compl. ¶¶ 45, 49-54]. Beyond this relationship and Myers' employment with CrossCountry, there are no facts alleged to support AmNet's theory that Thomas and Myers were conspiring. Myers' Motion to Dismiss is due to be <u>granted</u> as to Count Ten.[20]

Secondly, AmNet uses the same factual allegations for both the civil conspiracy and GTSA claims. AmNet has not provided new or different facts from

---

[19] The inference AmNet asks the Court to deduce regarding Myers' conduct is more constrained than with Thomas. Unlike Thomas, who AmNet employed, Myers worked for CrossCountry, meaning that AmNet has no actual knowledge or specific facts upon which to attribute or infer an improper motive to Myers. AmNet's allegations concerning Myers are vague and speculative.

[20] AmNet, having already been placed on notice of the pleading deficiencies in its original complaint, requests an opportunity to amend its Amended Complaint in the event the Court finds that AmNet failed to state any of its claims against Myers. [Dkt. 40 – Pl. Opp'n to Myers' MTD at 32 n. 11].

those already alleged for the trade secret claims. Thus, AmNet's civil conspiracy claim is due to be dismissed as preempted by the GTSA.

### 4.  Conclusion

While aspects of AmNet's state law claims may be preempted by the GTSA (i.e., to the extent the underlying conduct is premised upon appropriation of trade secrets), AmNet's state law claims survive with the exception of civil conspiracy.[21]

Defendants' Motions to Dismiss are <u>granted, in part</u>, and <u>denied, in part</u>. Defendants' motions are <u>granted</u> as to Count Ten and on Counts Five and Six <u>granted</u> only to the extent that the GTSA preempts tort claims premised upon the misappropriation of AmNet trade secrets.

### F.  RICO Claims

AmNet asserts violation of state and federal RICO as well as a conspiracy to violate RICO against CrossCountry and Myers. AmNet's civil RICO claims must be pled with specificity.  <u>Ambrosia Coal & Constr. Co. v. Pages Morales</u>, 482 F.3d 1309, 1316 (11th Cir. 2007); <u>U-Tec Constr., Inc. v. Phoenix Loss Control, Inc.</u>, 2022 WL 902727, at *3 (N.D. Ga. Mar. 28, 2022) ("Civil RICO claims, which are

---

[21] CrossCountry seeks partial preemption for aspects of AmNet's unfair competition claim based upon alleged misappropriation of AmNet's proprietary information.

essentially a certain breed of fraud claims, must be pled with an increased level of specificity.")

Defendants CrossCountry and Myers both move for dismissal of AmNet's RICO claims. Defendants contend that AmNet cannot allege facts to support the existence of an enterprise or a pattern of racketeering activity. Meyers also argues that the Amended Complaint lacks facts that advance AmNet's RICO theory.  [See Am. Compl. ¶¶ 126, 127].  As previously noted, Defendant Myers argues persuasively that AmNet's allegations concerning his purported role are wholly speculative.

The Court addresses the defense challenges below and concludes that AmNet's civil RICO causes of action, including conspiracy to violate RICO, are due to be dismissed.

### 1.  Violation of Federal Civil RICO, 18 U.S.C. § 1691

To adequately state a federal civil RICO claim, AmNet "must plausibly allege six elements:  that the defendants (1) operated or managed (2) an enterprise (3) through a pattern (4) of racketeering activity that included at least two predicate acts of racketeering, which (5) caused (6) injury to the business or property of [AmNet]."  Cisneros, 972 F.3d at 1211 (citing Ray, 836 F.3d at 1348); Jackson v.

37

BellSouth Telecomms., 372 F.3d 1250, 1264 (11th Cir. 2004) (basic requirements

include establishing a RICO "enterprise" and a "pattern of racketeering activity").

     "[T]he RICO statute provides that its terms are to be 'liberally construed to

effectuate its remedial purposes.'" Boyle v. United States, 129 S. Ct. 2237, 2243

(2009).  "A RICO enterprise exists 'where a group of persons associates, formally

or informally, with the purpose of conducting illegal activity.'" Jackson, 372 F.3d

at 1264 (citation omitted). "Racketeering activity" includes such predicate acts as

mail or wire fraud, see 18 U.S.C. § 1961(1), which "occurs when a person (1)

intentionally participates in a scheme to defraud another of money or property and

(2) uses the mails or wires in furtherance of that scheme." Lechter v. Aprio, LLP,

565 F. Supp. 3d 1279, 1314 (N.D. Ga. 2021) (quoting Am. Dental Ass'n v. Cigna

Corp., 605 F.3d 1283, 1290 (11th Cir. 2010)).[22]  A pattern of racketeering activity

may be established where evidence exists that "(1) the defendants committed two

or more predicate acts within a ten-year time span; (2) the predicate acts were

---

[22] In American Dental, a group of dentists alleged that dental insurance companies, by engaging in fraudulent claim-processing practices, had been withholding portions of reimbursements lawfully owed to the dentists for dental services rendered under managed-care plans.  605 F.3d at 1286 & n.1. The dentists claimed that the insurance companies were liable under RICO for violating §§ 1962(c) and (d). Id. at 1287. The Eleventh Circuit held that, at most, plaintiffs alleged parallel conduct but not a conspiratorial agreement. Id. at 1295; and see Almanza v. United Airlines, Inc., 851 F.3d 1060, 1070 (11th Cir. 2017).

related to one another; and (3) the predicate acts demonstrated criminal conduct of a *continuing* nature." Jackson, 372 F.3d at 1264 (citing, *inter alia*, 18 U.S.C. § 1961(5)).

**A. Enterprise**

The federal RICO statute defines an "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

Here, AmNet asserts an association-in-fact enterprise, comprised by CrossCountry, Myers, and the Transition Desk loan officers.[23]  The Supreme Court instructs that an association-in-fact enterprise must possess three structural qualities: "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." Boyle, 129 S. Ct. at 2244; Ray v. Spirit Airlines, Inc., 836 F.3d 1340, 1352 (11th Cir. 2016). It is "simply a continuing unit that functions with a common purpose." Boyle, 129 S. Ct. at 2245. An association-in-fact enterprise need not have a hierarchical structure, specific governing procedures, or fixed roles for its

---

[23] In its Amended Complaint, AmNet names two individual CrossCountry employees who allegedly "directly assisted in Thomas's unlawful loan diversion" -- Cari Lapinski, a loan officer assistant; and Amber Schuiteman, a senior processor.  [Am. Compl. ¶ 34]. AmNet also asserts that Thomas and CrossCountry utilized Transition Desk loan officers to originate loans in the loan officers' names for CrossCountry.  [Am. Compl. ¶ 41].

members.  Id. What is required is "evidence of an ongoing organization, formal or informal, and ... evidence that the various associates function as a continuing unit." Id. at 2243 (quoting United States v. Turkette, 101 S. Ct. 2524, 2528 (1981)).

As explained below, AmNet's inability to allege facts in support of a RICO "enterprise" is determinative of its federal RICO claim.

### 1.  Purpose

As for purpose, AmNet describes the alleged purpose of the association-in-fact enterprise in the Amended Complaint within Paragraphs 126 and 127 of the Amended Complaint.  In short, AmNet alleges that:

> 126. Defendants have committed a series of predicate acts – including wire fraud (18 U.S.C. § 1343), interstate transportation of money taken by fraud (18 U.S.C. § 2314), and fraud against a financial institution (18 U.S.C. § 1344) – by stealing AmNet's and other mortgage lenders' trade secrets and proprietary information in violation of the Defend Trade Secrets Act in violation of 18 USC §1962. Further, Defendants have utilized mails and wires to perpetrate a fraud for purposes of obtaining access to competitors' trade secrets and diverting the value and benefit of those trade secrets for CrossCountry's own unlawful purposes.
>
> 127. Defendants Myers and CrossCountry have maintained and overseen a pattern of racketeering activity by maintaining a deliberate system and infrastructure to steal trade secrets from other competitors, incentivizing teams of unlicensed transitioning loan officers using deceptive means and instrumentalities to gain access to competitors' trade secrets and divert loans and trade secrets to CrossCountry.

[Am. Compl. ¶¶ 126, 127].

The common purpose component is adequately pled.

## 2. Longevity

The Court also finds that the facts pled support longevity and/or continuity by asserting that the prohibited conduct occurred at least for four months (May to August 2022). [Am. Compl. ¶ 125 (incorporating ¶¶ 1-124)].

The closer question is whether AmNet pleads sufficient facts showing that the relationships identified support the structural requirement and are sufficient to infer that an agreement was in place amongst the members to carry out the common purpose of the enterprise.

## 3. Relationships Among Associates

An association-in-fact enterprise requires more than a common purpose; "*relationships* between the associates of the enterprise must exist as well." Almanza, 851 F.3d at 1073 (citing Boyle, 129 S. Ct. at 2243) (noting "distinct structural elements of a RICO associated-in-fact enterprise" in contrast to RICO conspiracy). Facts must be alleged showing that an agreement actually existed amongst the associates to achieve the enterprise's purpose. Id. at 1068 (citations omitted). "To cross the line from a possible to a plausible existence of an agreement, plaintiffs must allege a further circumstance pointing toward a meeting of the minds." Almanza, 851 F.3d at 1068 (citation and internal quotation marks

omitted).  Absent alleged facts showing the existence of an actual agreement, merely stating that an agreement exists constitutes a legal conclusion, which is inadequate for pleading purposes.  Id. (citation omitted).

In this case, AmNet's allegations that an agreement was reached between CrossCountry and Myers, and/or CrossCountry Transition Desk loan officers are conclusory and, therefore, insufficient. [Am. Compl. ¶ 141 ("CrossCountry and Myers together reached an agreement to violate the federal RICO statute, by misappropriating the trade secrets of AmNet.")]. See U-Tec Constr., Inc. v. Phoenix Loss Control, Inc., No. 1:21-CV-00265-JPB, 2022 WL 902727, at *4 (N.D. Ga. Mar. 28, 2022) (finding plaintiff's assertion regarding the existence of a RICO "enterprise" a legal conclusion; and stating that the court is not obliged to accept plaintiff's enterprise allegations as true in the absence of supporting facts) (citation omitted).  AmNet does not allege how or when or any other facts to reflect that a meeting of the minds occurred concerning the alleged common purpose of the enterprise. "[P]arallel conduct alone cannot support a plausible inference of an agreement."  Almanza, 851 F.3d at 1068.  While RICO is a broad statute, "it cannot be invoked every time a group of people [allegedly] causes an injury."  Cisneros, 972 F.3d at 1208.

In addition, CrossCountry and Myers contend that AmNet is unable to plead facts to show the existence of an enterprise because "the racketeering enterprise and the defendant must be two separate entities." Ray, 836 F.3d at 1355 (citing Cedric Kushner Promotions, Ltd. v. King, 121 S. Ct. 2087, 2090 (2001)). In other words, the Eleventh Circuit has held that a plaintiff "may not plead the existence of a RICO enterprise between a corporate defendant and its agents or employees acting within the scope of their roles for the corporation." Id. at 1357. On the other hand, AmNet contends that the structural distinctiveness requirement is satisfied because it has alleged multiple actors formed the enterprise and that CrossCountry is only one part of the enterprise.

According to Defendants, since Myers was an employee of CrossCountry, and acting within the scope of his employment at all times, the Court should conclude, as a matter of law, that AmNet's factual allegations do not plausibly support the existence of an association-in-fact enterprise.[24] As emphasized by Myers, AmNet's Amended Complaint does not allege that Myers was operating

---

[24] In response, AmNet contends that the distinctiveness inquiry is generally considered an issue of fact better addressed after discovery. [Dkt. 40 at 12 n.4]. "[D]istinctness is a fact-intensive inquiry that is not driven solely by formal legal relationships." Lockheed Martin Corp. v. Boeing Co., 314 F.Supp.2d 1198, 1212 (M.D. Fla. 2004); Hepp v. Paul Revere Life Ins. Co., No. 8:13-CV-02836-EAK, 2014 WL 3865389, at *3 (M.D. Fla. Aug. 5, 2014) (citation omitted).

beyond the scope of his employment with CrossCountry or outside CrossCountry's control.  In fact, AmNet alleges that Myers was at all times being supervised by CrossCountry's Chief Production Officer.  [Am. Compl.  ¶¶ 4, 29, 32-33, 39, 41, 42, 43-44, 47-58, 127, 134].  AmNet further alleges that Myers was operating under written policies and procedures implemented by CrossCountry.  [Am. Compl. ¶ 55].  As a corporate entity only able to act through its agents and employees, CrossCountry could not have formed a RICO enterprise with Myers or its Transition Desk personnel. See Ray, 836 F.3d at 1356.

AmNet's inclusion of the "Transition Desk" or "Transition Desk loan officers" as alleged enterprise member(s) does not alter the Court's analysis. AmNet alleges in its Amended Complaint that Myers "created" the transition Desk when he began working with CrossCountry.  [Am. Compl. ¶¶ 4, 32, 57]. Accepting this allegation as true, AmNet also alleges that the Transition Desk and operations were conducted while Myers was a CrossCountry employee and while under the supervision of a CrossCountry executive.  [Am. Compl. ¶ 44].

Because AmNet fails to plead an association-in-fact enterprise, there is no need for the Court to discuss the other requirements for stating a claim under § 1691.  U-Tec Constr., Inc., 2022 WL 902727, at *4.

Defendants' Motions to Dismiss are granted as to Count Nine.

## 2.  Violation of Georgia Civil RICO, O.C.G.A. § 16-14-2(b)

AmNet also alleges violation of Georgia's Civil RICO statute by CrossCountry and Myers.[25]

Georgia's RICO Act, modeled after the federal RICO scheme, is intended to "apply to an interrelated pattern of criminal activity motivated by or the effect of which is pecuniary gain or economic . . . threat or injury. . . ." O.C.G.A. § 16-14-2(b); Williams Gen. Corp. v. Stone, 279 Ga. 428, 430 (2005) (looking to federal authority when interpreting the Georgia RICO statute given similarities between federal and state statutory schemes).  Although not identical, given the similarities between the federal and state statutes, a litigant's inability to state a federal claim generally warrants dismissal under Georgia RICO. Cisneros, 972 F.3d at 1221 (quoting Feldman v. Am. Dawn, Inc., 849 F.3d 1333, 1342 (11th Cir. 2017)).

Georgia's civil RICO statute differs from the federal statute in that (1) not all provisions of the Georgia RICO statute require the existence of an "enterprise" and (2) there is no continuity requirement for the pattern of racketeering activity element.  See, e.g., Lechter v. Aprio, LLP, 565 F. Supp. 3d 1279, 1317 (N.D. Ga. 2021) (citing Chesapeake Emp'rs Ins. Co. v. Eades, 77 F. Supp. 3d 1241, 1256

---

[25] The Court has already determined that AmNet's allegations concerning Myers are deficient.

(N.D. Ga. 2015)).  Rather than requiring continuing racketeering activity, Georgia

RICO requires that the predicate acts "have the same or similar intents, results,

accomplices, victims, or methods of commission." Burchett v. Lagi, 2012 WL

3042984, at *5 (N.D. Ga. July 25, 2012) (quoting O.C.G.A. § 16-4-3(8)).

### a.  Enterprise Requirement

In its Amended Complaint, AmNet realleges paragraphs 1 – 142 for

purposes of its Georgia civil RICO claim and does not specify which provision(s)

of the Georgia statute Count Twelve is premised on.[26]  This style of pleading,

namely, when "each count in the complaint incorporates each antecedent

allegation," is commonly known as a shotgun pleading.  Glock v. Glock, 247 F.

Supp. 3d 1307, 1313 (N.D. Ga. 2017), aff'd, 714 F. App'x 987 (11th Cir. 2018)

(citation omitted); and see Weiland v. Palm Beach Cnty. Sheriff's Office, 792 F.3d

---

[26] O.C.G.A. § 16-14-4(a) ("subsection(a)"), provides:

> It shall be unlawful for any person, through a pattern of racketeering
> activity or proceeds derived therefrom, to acquire or maintain, directly or
> indirectly, any interest in or control of any enterprise, real property, or
> personal property of any nature, including money.

O.C.G.A. § 16-14-4(b) ("subsection(b)"), states:

> It shall be unlawful for any person employed by or associated with any
> enterprise to conduct or participate in, directly or indirectly, such enterprise
> through a pattern of racketeering activity.

1313 (11th Cir. 2015) (identifying the different types of shotgun pleadings).

Shotgun pleadings make the Court's Rule 12 analysis more onerous in that "most

of the counts (i.e., all but the first) contain irrelevant factual allegations and legal

conclusions" such that, "in ruling on the sufficiency of a claim, the trial court must

sift out the irrelevancies. . . ."  Strategic Income Fund, L.L.C. v. Spear, Leeds &

Kellogg Corp., 305 F.3d 1293, 1295 (11th Cir. 2002) (citations omitted).

In any event, to establish a violation of the Georgia RICO statute under

subsection (a), Plaintiffs must allege and ultimately show "proof that the defendant

committed predicate offenses . . . at least twice." Lechter, 565 F. Supp. at 1317

(quoting Cobb Cnty. v. Jones Grp., P.L.C., 218 Ga. App. 149 (1995); accord

Williams v. Mohawk Indus., 568 F.3d 1350, 1356 (11th Cir. 2009)).  However,

subsection (b) of the Georgia civil RICO statute, O.C.G.A. § 16-14-4(b), which

prohibits conducting or participating in an enterprise, corresponds with the federal

civil RICO claim, § 1962(c).  Cisneros, 972 F.3d at 1221 (citation omitted).  And,

subsection (b) *does* require facts alleging proof of an enterprise.  Id. (citing

Kimbrough v. State, 300 Ga. 878, 799 (2017)).

Having reviewed the allegations in the Amended Complaint, it appears to

the undersigned that AmNet intended to proceed under subsection (b), which

requires a RICO enterprise.[27] AmNet's briefing, however, argues that AmNet has sufficiently pled a claim pursuant to § 16-14-4(a), with no enterprise element. [Dkt. 38 at 38 ("These allegations . . . are sufficient to plead a claim under Georgia RICO subsection (a).")].  Because AmNet's argument is not necessarily precluded by the Amended Complaint, the Court questions whether failure to allege a RICO enterprise mandates dismissal of Count Twelve.  Still, AmNet's Amended Complaint does not include "facts that specifically bear on § 16-14-4(a)." Cisneros, 972 F.3d at 1221 (dismissing Georgia civil RICO claim for failing to allege facts in support of § 16-4-4(a) cause of action).  For this reason, the Court finds the Amended Complaint deficient and subject to dismissal for the same reasons discussed in connection with the federal civil RICO claim.

### b.  Failure to Satisfy Rule 9(b)

Regardless, AmNet's Georgia civil RICO claim is also subject to dismissal for failure to plead with particularity.  Glock, 247 F. Supp. 3d at 1314.  When Rule 9(b) applies, "pleadings generally cannot be based on information and belief [.]"

---

[27] CrossCountry appears to accept that AmNet's Georgia RICO claim does not require an enterprise.  [Dkt. 43 at 19 (describing AmNet's cause of action as under O.C.G.A. § 16-14-4(a))].  However, the Amended Complaint only mentions that Georgia's RICO statute is "codified as OCGA § 16-14-3, *et seq*."  [Am. Compl. ¶ 145].

Id. "Bald or otherwise conclusory allegations will not suffice."[28] Id.; accord

ThermoLife Int'l, LLC, 2019 WL 12291350, at *10 (finding Georgia civil RICO

claims deficient for reliance on "magic words" and failing to "put defendants on

notice of specific acts, statements, documents, places, and people").  Here, as

previously discussed, AmNet's most critical allegations are either conclusory or

premised "upon information and belief" as opposed to specific facts.  Failure to

satisfy the heightened pleading standard is another potential basis for dismissal of

AmNet's Georgia civil RICO claim.

c. **Preemption**

In addition, AmNet's Georgia civil RICO claim is preempted by its GTSA

claim to the extent that AmNet relies upon the misappropriation (or theft) of trade

secrets – a civil action -- as a predicate offense. [Am. Compl. ¶ 148].

"[T]he only exceptions to the exclusivity of the GTSA are contained in

OCGA § 10–1–767(b)."[29]  Robbins v. Supermarket Equip. Sales, LLC, 290 Ga.

---

[28] "Rule 9(b)'s heightened pleading standard is applied less stringently when specific factual information about the details of the fraud are peculiarly within the defendants' knowledge or control."  Id.

[29] Pursuant to Section § 10–1–767(b), the GTSA carves out exceptions for the following claims:

> (1) Contractual duties or remedies, whether or not based upon misappropriation of a trade secret; provided, however, that a contractual duty to maintain a trade secret or limit use of a trade secret shall not be

462, 465–66 (2012).  While it is plain that the gravamen of AmNet's Georgia

RICO claim is Defendants' alleged misappropriation of trade secrets [Am. Compl.

¶¶ 148, 150-151], AmNet also alleges residential mortgage fraud in violation of

O.C.G.A. § 16-8-102 [Am. Compl. ¶ 149] and Georgia predicates of theft, in

violation of O.C.G.A. § 16-8-1, and computer theft, in violation of O.C.G.A. § 16-

9-93 [Am. Compl. ¶ 150], as predicates.  Arguably, AmNet's allegations of

criminal theft fall under the third exception.  See §§ 10-1-76(b)(3).  CrossCountry

persuasively argues that the only "property" allegedly taken is AmNet's

proprietary information and that, even if not trade secrets, the predicates are

preempted.  [CrossCountry Reply at 19].  The GTSA preempts tort claims for the

alleged "misappropriation" of any allegedly valuable or proprietary information

(*i.e.*, ideas, inventions, formulas, etc.)—even if that information is not a trade

secret. See Robbins, 290 Ga. at 465–66 ("The GTSA supersedes *all* conflicting

---

deemed void or unenforceable solely for lack of a durational or
geographical limitation on the duty;
(2) Other civil remedies that are not based upon misappropriation of a trade
secret; or
(3) The definition of a trade secret contained in Code Section 16-8-13,
pertaining to criminal offenses involving theft of a trade secret or criminal
remedies, whether or not based upon misappropriation of a trade secret.

laws providing restitution or civil remedies for the misappropriation of trade secrets.") (emphasis added).[30]

As for the computer theft predicate, AmNet's grievance concerns the theft of AmNet's confidential and proprietary information – not that the computer itself was stolen.  Under Robbins, the criminal computer theft predicate cannot support the Georgia civil RICO claim. 722 S.E.2d at 58. The only remaining possible predicate is residential mortgage fraud, which falls within the scope of § 10-1-76(b)(2).

For the reasons previously stated, the Court agrees with CrossCountry that, AmNet's non-preempted predicate (i.e., residential mortgage fraud) is not pled with particularity. [Dkt. 43 - CrossCountry Reply at 19-20 ("Because the trade-secrets theory underlying AmNet's Georgia's RICO claim is preempted and its fraud theory is inadequately pled, Count Twelve must be dismissed.")].  AmNet alleges in its Amended Complaint that Thomas "made material misrepresentations" to AmNet's prospective borrowers. AmNet does not allege

---

[30] As argued by CrossCountry, "RICO itself requires that any predicate offense be "indictable" under state or federal law. 18 U.S.C. § 1961(1)(B). Because the alleged Georgia theft predicates involve alleged trade secrets, they are preempted by the GTSA and therefore not indictable for RICO purposes."  [CrossCountry Reply at 19 n. 3 (quoting Robbins, 722 S.E.2d at 58)].

supporting dates, identities of borrowers, actual contents of any of the communications, or other background facts to describe the supposedly false statements.[31]

Defendants' Motions to Dismiss are <u>granted</u> as to Count Twelve.

### 3.  Conspiracy to Violate RICO

AmNet next alleges that CrossCountry and Myers conspired to violate federal RICO (18 U.S.C. § 1962(d)) and Georgia RICO (Ga. Code Ann. § 16-14-4(c)). As noted by Plaintiff, "[t]here is no apparent substantive difference between the requirements for establishing a conspiracy to violate Federal RICO claim and a conspiracy to violate Georgia RICO claim." <u>Lechter</u>, 565 F. Supp. 3d at 1332.

It is true that "a party may be liable for RICO conspiracy even if it is not liable for the substantive RICO offense." <u>Jackson</u>, 372 F.3d at 1269; <u>see also</u> <u>Turk v. Morris, Manning & Martin, LLP</u>, 593 F. Supp. 3d 1258, 1310 (N.D. Ga. 2022), <u>reconsideration denied</u>, No. 1:20-CV-2815-AT, 2023 WL 2359692 (N.D. Ga. Feb. 13, 2023) (same).  Indeed, a plaintiff may establish conspiracy to violate RICO by showing that defendants either (1) "agreed to the overall objective of the conspiracy" or (2) "agreed to commit two predicate acts."

---

[31] The facts AmNet alleges for purposes of the Lanham Act claim do not support the mortgage fraud claim.

The Court finds AmNet's allegations insufficient to support its conspiracy to violate civil RICO for the same reasons previously discussed in connection with the civil conspiracy claim and federal and state civil RICO claims.  In sum, AmNet fails to allege sufficient facts to show the existence of an agreement.

Defendants' Motions to Dismiss are granted as to Count Eleven.

## CONCLUSION

For the foregoing reasons, the Court finds that Plaintiff's Amended Complaint alleges sufficient facts to place Defendants on notice of the nature of AmNet's claims.  Accordingly, Defendants' Motions to Dismiss are granted, in part, and denied, in part, as stated below.  It is **ORDERED** that:

(1) Defendant CrossCountry's Motion to Dismiss [Dkt. 34] is **DENIED** as to Counts 3, 7, and 8, **DENIED in part** and **GRANTED in part** as to Counts 5-6, and **GRANTED** as to Counts 4 and 9-12.

(2) Defendant Thomas' Motion to Dismiss [Dkt. 35] is **DENIED** as to Counts 1, 4 and 7, **DENIED in part** and **GRANTED in part** as to Counts 2 and 5-6, and **GRANTED** as to Counts 10 and 11;

(3) Defendant Myers' Motion to Dismiss [Dkt. 36] is **GRANTED** as to Counts 9-12.  Because Myers' Motion to Dismiss is granted in its

entirely, the Clerk is **DIRECTED** to reflect this change on the docket and terminate him from the case.

To summarize what remains in the case:

**Count One** alleging breach of contract will proceed against Defendant Thomas;

**Count Two** alleging breach of fiduciary duty will proceed against Defendant Thomas on Plaintiff's allegation that Thomas diverted AmNet clients or customers but not on Plaintiff's allegation that Thomas solicited AmNet employees to leave and come work for CrossCountry;

**Count Three** alleging aiding and abetting breach of fiduciary duty will proceed against Defendant CrossCountry;

**Count Four** alleging violation of the Lanham Act will proceed against Defendant Thomas only;

**Counts Five and Six** alleging tortious interference and unfair competition under state law will proceed against Defendants CrossCountry and Thomas, but only to the extent Plaintiff's allegations are not premised on the alleged misappropriation of AmNet's trade secrets or other proprietary information under the GTSA; and

**Counts Seven and Eight** alleging misappropriation of trade secrets in violation of GTSA and DTSA will proceed against Defendants CrossCountry and Thomas.

**Counts Nine thru Twelve** are dismissed.

**SO ORDERED** this 18th day of December, 2023.

_____

**RICHARD W. STORY**
United States District Judge